Spring Term 1839.

## Hanson and Others *against* Power.

CHANCERY

[Mr. W. C. Marshall for appellants: Mr. Hord for appellee.]

FROM THE CIRCUIT COURT FOR BRACKEN COUNTY.

Judge EWING delivered the Opinion of the Court.

May 2.

THOMAS BUCKNER, by deed bearing date the 10th day of February, 1830, and purporting to be founded on the consideration of three hundred dollars, conveyed the tract of land upon which he lived to John Hanson, his father-in-law. Shortly afterwards, Buckner, (he being a profligate, drunken and worthless man,) and his wife separated, and she left him and went to her father's, with her children, for support and protection. Her father died shortly afterwards—having made his will, by which he devised the tract of land conveyed to him by Buckner, to his son Greenberry Hanson, and required him to execute his bond to Mrs. Buckner, to hold the land in trust for the use of her and her children.

J. F. Powers recovered a judgment against Buckner, on a note for eighty four dollars and sixty three cents, dated the 4th October, 1831; had an execution returned thereon no property found, and filed a bill against G. Hanson and Buckner, to set aside the conveyance to John Hanson and the devise to G. Hanson, and subject the land to the payment of his judgment—charging that the conveyance was voluntary, and made to hinder and delay creditors; and that many of the items of which it was composed, occurred in 1829.

Greenberry Hanson answered, denying the fraud, and having near the grantor's residence, having an execution against him, returned no property—filed a bill in chancery to subject the land to that and other debts—charging that the conveyance was voluntary, and made to hinder and delay creditors, and especially to defraud him. But it appears that the debts—though alleged to have existed before the conveyance—were, in fact, created afterwards, and chiefly *for liquor* furnished, at the complainant's tavern, and in violation of his license bond and his moral obligations, to the debtor; who, having become a miserable sot, spent most of his time there, in idleness and drunkenness, to his own ruin and the great distress of his family. It further appears, that there was collusion between him and the complainant—to subject the land, for amounts made up between them, of claims partly fictitious, with an understanding that the debtor should have part of the proceeds.—And tho', to some extent, the demands set up in the bill, were probably pure, as the complainant refused to separate them from the rest, they must share the same fate. The complainant is entitled to no relief: his bill must be dismissed with costs.

*Margin headnote:* No demand that had its origin in moral turpitude, or which was created in violation of a statute, can be enforced in a court of law.—Nor will a court of equity lend the slightest aid towards collecting or enforcing any claim or demand thus contaminated.

A man who had fallen into dissolute habits, conveyed a tract of land to his father-in-law, by a deed in which a valuable consideration was expressed. The grantee, having previously paid part of the grantor's debts, then paid the residue; & received & supported his wife & children, who were soon compelled, by his neglect, to abandon him, and finally devised the land in trust for them, and died.—After which, a tavern keeper li-

alleging that the conveyance was *bona fide,* and made for a valuable consideration; makes his answer a cross bill, and charges that John Hanson was the father-in-law of Buckner; that the latter had fallen into habits of the most reckless dissipation and drunkness, to the total neglect of his wife and children, and he anticipated a separation between them, which did take place shortly after the deed was made; and they had been taken to the house of her father, and provided for by his bounty, during his life, and ever since by the family. That Buckner was in the constant habit of frequenting the tavern of the complainant, which was near his residence, and was furnished by him with the means of intoxication, and was permitted to tipple and drink to excess, and lie drunk at his tavern, and that the debt set up by the complainant, if it existed at all, had been contracted for spirits furnished him; and calls upon him to exhibit the items of his account, and show the consideration upon which his claim was founded—charging that it was made up between Buckner and the complainant, as a device to reach the land, long after the deed was made.

The complainant answers the cross bill evasively; fails to exhibit his accounts, or to show satisfactorily the consideration; but amends his bill, and sets up various other notes and judgments and executions thereon, which purport to have been executed at different times— one in 1830, the rest in 1832–3, and each for amounts between forty and fifty dollars; also, he sets up some judgments for small amounts, assigned to him by others, but all having their origin long after the date of the conveyance; which he prays may be satisfied out of the land.

Hanson answered the amended bill—reiterating that the various judgments in the name of the complainant, were founded on demands for whiskey, furnished by the complainant to Buckner, at his tavern, and by which Buckner was constantly kept drunk, to the neglect of his family and ruin of himself.

Buckner died, and the suit was revived against his wife and children.

Upon the hearing, the Circuit Court sustained all the demands of the complainant, and decreed so much of the land to be sold, as would satisfy them and costs, and the defendants have appealed to this Court.

.. None of the notes upon which the judgments set up by the complainant are founded, bear date short of near two years after the date of the deed, except one which seems to have been satisfied, and it bears date several months after the date of the deed. And it is not shown in proof, though charged in the bill, that any of the items of account, of which they are composed accrued, before. And, in the complainant's answer to the cross bill, he admits, by his failure to respond to a specific allegation on the subject, that the account filed with the note in the papers of the common law suit, made out, as to the greater part of the amount, as of the date of 1829, "was made up between him and Buckner, on the day of the date of the note set up in his original bill, for the purpose of reaching the land.". And he is compelled, in the same answer, in giving an account of the items of account of which the note is composed, to admit that they had their origin long after the date of the conveyance, and long after the date of 1829, which he had charged in his original bill was the date of their accrual.

A cloud of suspicion hangs over his claims, or those, at least, of which the note of eighty four dollars and sixty three cents is composed. Besides the answer to the cross bill, and proof tending to show that those items had been hatched up long after the date of the deed, (though charged and attempted to be palmed off upon the Court, in his original bill, as having accrued before,) with a view to reach the land—other suspicuous circumstances are shown.

One of those items is for money paid Gross. Gross proves that the complainant never paid him the amount. Another is for seventeen dollars—the balance of an execution: it is proven by the returns upon the execution that the whole amount had been paid long before. Another is for thirty dollars paid as costs of suit. It turns out, that the costs alluded to, are the costs in a writ of

forcible entry and detainer, prosecuted by the complainant, as purchaser from Buckner against another person, in which Buckner, was introduced by him as a witness, and swore that he had no interest, directly or indirectly, in the event of the suit.

And Buckner's deposition having been taken by the complainant in this case, he swears, upon cross examination, that he *never agreed to pay the costs*, though he admits afterwards, upon the interrogatory of the complainant, on this subject, that " there was *some such talk.*" He is also made to say, at the instance of the complainant, that the deed was made to *avoid* the payment of the *debts set up by the complainant*, though it is now evident that they were all contracted long subsequent to the execution of the deed. He admits, also, that he *expected to get some part of the property in contest, if the complainant succeeded*, though there was no *particular* contract to that effect. All which indicates strongly, that Buckner was the tool and victim of the complainant, ready to do his bidding, but was too stupid and besotted to understand what was necessary to be said, or kept back. These facts extracted from Buckner, when connected with the complainant's declaration to another witness, to wit, that the Hansons had cheated Buckner out of his property, and he would show them whether they would hold it, together with his declaration to Gross, to whom Buckner was indebted, that he had money in his hands due Buckner, and if he would get an order from him, he would pay it; also the fact, that Buckner had conveyed to him fifty acres of land, by deed, dated the 23d January, 1829, the consideration for which, expressed on the face of the deed, is sixty dollars; also a lot of ground, by deed dated the 25th August 1831, at the consideration of forty dollars; and he was co-tenant with Buckner in 1831, and purchased his interest in the crop, all of which he states in his answer to the cross bill, he settled and allowed Buckner credit for, in their various settlements of his accounts, yet *exhibits no accounts, though expressly called on for them*, all seem strongly to indicate, that the claims, or many of them, were contrived between the complainant and

Buckner, to enable the former to wrest from the Hansons the land in contest, under the pretence of being a creditor, which Buckner could not himself accomplish; and to furnish the latter with the means to become a profitable customer, at the tavern of the complainant; or if they ever existed, that they had been settled and paid off.

As to the residue of the claims set up by the complainant, upon notes executed to him, they accrued afterwards, from time to time, during the life of Buckner, and were mainly for whiskey furnished at the tavern of the complainant, where Buckner was permitted to buy, and to tipple and drink, and lie drunk, from time to time, in violation of the condition of the complainant's tavern bond, and against the duty imposed upon him as a tavern keeper, and his moral obligation as a citizen. Although some of the items in his claims may have been, and no doubt were, for other articles than whiskey furnished to Buckner, as he has refused to exhibit his accounts, those items cannot be distinguished from the rest, and must, therefore, share their fate.

For claims having their origin in moral turpitude, and a known violation of a penal statute, a Chancellor will not afford relief. He who is guilty of iniquity cannot have equity.

Even at law, relief will not be afforded for demands based upon, or having their origin in, a violation of the law. *Armstrong* vs. *Taylor*, 6 *Cond. R. U. S.* 298; *Wilhite* vs. *Roberts*, 4 *Dana*, 174; *Steel* vs. *Curle, same,* 382. Much less will a Chancellor afford relief, in whose tribunal a complainant should present himself clothed with equity and fairness in the demands set up by him.

In furnishing the spirits to Buckner, which compose, as we are left to infer, the principal items of the complainant's demands, he not only did it, and thereby prompted him to drink to excess, in violation of the condition of his bond, but furnished him with the means to destroy himself, and to disable and disqualify him for the performance of those duties which devolved on him as a husband and father; and thereby created a demand

Spring Term
1839.

Hanson &c.
vs
Power.

against Buckner, which he could not hope to collect, except by wresting from the wife and children the means which had been secured to them, by her father, by deed made and recorded long before his debts were contracted; and of the real object and intention of which, he must have been fully apprized long before his claims accrued.

Under these circumstances, we do not feel warranted in interposing the arm of this Court to afford him aid, in enforcing claims so unmeritorious, and having their origin under circumstances so little entitled to favor or regard in a court of justice. It is the *bona fide* creditor only that is entitled to relief.

The deposition of a *deft.* if taken without an order of court—according to a former decision, should be rejected.

Where it appears that a witness has impaired his intellect by dissipation; is much under the influence of the party taking his deposition, and free to answer according to his wishes, even though his answers are thereby rendered inconsistent with each other, and with other facts established in the case—the dep'n should be disregarded. And the deposition of the debtor, in this case, being of that character —there is no sufficient evidence that the deed was made to defraud creditors: the contrary, in fact, appears from other circumstances.

But another objection lies to the relief sought by the complainant, and which applies, not only to the claims set up in his own name, but also to those set up by him as assignee.

Buckner was a defendant in the suit when his deposition was taken, and it was taken without an order of the Chancellor authorizing it to be taken, and it was excepted to by the counsel for the other defendants. It has been said by our predecessors, that this is a good ground for its rejection. But waiving this ground, it bears upon its face intrinsic evidence of its own condemnation. His contradictions and statement of facts ascertained to be indisputably false; the interest which he felt that he had in the success of the complainant, founded upon his expectation of getting a part of the property, though, to use his own language, he had no *particular contract* about it; the facility with which he is made to answer favorably to the complainant, any question put by him, though contradictory to his prior statement and to the truth—all go to show, that he was either too depraved, or too stupid from intemperance, or too much under the influence of the complainant, and of his own expectation of interest, to be relied on as a witness.

Disregarding his testimony, and there is nothing in the record to satisfy the Court, that the deed was voluntary, or made to defraud creditors. That it was not voluntary is evident. But it was made in considera-

tion of debts that Hanson had paid for Buckner, and his agreement to pay all his then subsisting debts, which he has faithfully done; and not a single debt that was then outstanding is shown in the record to be now owing. The consideration may not have been adequate; but even that is not shown, for there is no proof of the value of the land. But in addition to a valuable consideration, the most meritorious one is shown—that of providing for a wife and children, to which there is but little doubt Buckner was induced to accede by Hanson, the father, who was willing to pay all the subsisting debts, to get the title vested in himself, as a means of rescuing from the future dissipation of a worthless and abandoned husband, a home for his daughter and grand children. Nor is there any thing in the proof, that would lead the mind to the necessary conclusion, that an intention to hinder, delay and obstruct subsisting creditors, existed; or which may not be construed as consistent with a fair and *bona fide* intention.

Buckner was not indebted to embarrassment. There seems to have been but a few small debts subsisting against him at the time; all of which, as has been already stated, Hanson was to pay, and did promptly pay, so soon as presented. It can, therefore, hardly be inferred, that the intention was to hinder, delay and obstruct their payment. And if it be admitted that subsequent creditors may take advantage of a fraud against prior creditors, the Chancellor will not resort to any strained construction of the proof, to arrive at it, but will rather incline to ascribe honest motives; especially when, as in this case, good reasons exist for ascribing a different motive from that of fraud.

Something is said by a witness, tending to show that the motive was to cover the land from a debt of Buckner Morris; but the proof is inexplicit and unintelligible, and it is not shown in proof, that any such debt ever existed. Something is also said about an indifference on the part of Buckner, as to the amount of consideration that should be inserted in the deed when it was drawn. He seems from intemperance to have became indifferent, in a greater or less degree, to all care

Spring Term
1839.

or consideration about any thing, except to indulge his appetite with the ardent draught. Again: the precise amount of indebtedness was not easily ascertained, or the amount paid, and the object seemed to be, to fix the consideration at an amount sufficient to cover both; and when the difficulty of arriving at the amount occurred, the expressions were made indicating the indifference as to the amount alluded to by the witness.

Upon the whole, we think that actual fraud against prior or subsequent creditors, is not made out; or not made out in such manner as to authorize subsequent creditors, whose debts were contracted with a full knowledge of the prior conveyance, to impeach the deed on the score of fraud. Prior creditors are not complaining, and the complainant, who is a subsequent creditor as to all his demands, and which, therefore, could not have been contracted upon the faith of the land in contest, as that was known to have been conveyed away before, has no just right to complain.

It is, therefore, the opinion of the Court, that the decree of the Circuit Court be reversed, and cause remanded, that the complainant's bill may be dismissed with costs; and the appellants are entitled to their costs in this Court.