## DAVID M. RICHARDSON v. CHRISTIAN H. BUHL AND RUSSEL A. ALGER.

*Monopolies—Public policy—Void contracts—Corporations.*

1. Courts will take notice, of their own motion, of illegal contracts which come before them for adjudication, and will leave the parties where they have placed themselves.

2. If a contract is void as against public policy, the court will neither enforce it while executory, nor relieve a party from loss by having performed it in part. *Foote v. Emerson*, 10 Vt. 344; *Hanson v. Power*, 8 Dana, 91; *Pratt v. Adams*, 7 Paige, 616; *Piatt v. Oliver*, 1 McLean, 280; *Stanton v. Allen*, 5 Denio, 434.

3. A corporation organized for the purpose of controlling the manufacture and sale of matches, and by means of which scheme all competition is stifled, and opposition crushed, and the whole business of the country in that line engrossed by said corporation, is a menace to the public; its object and direct tendency being to prevent free and fair competition, and control prices throughout the national domain. It is no answer to say that this monopoly has in fact reduced the price of friction matches. That policy may have been necessary to crush competition. The fact exists that it rests in the discretion of the corporation at any time to raise the price to an exorbitant degree. Such combinations have frequently been condemned by courts as unlawful, and against public policy. *Hooker v. Vandewater*, 4 Denio, 349; *Stanton v. Allen*, 5 Id. 434; *Coal Co. v. Coal Co.*, 68 Penn. St. 186; *Salt Co. v. Guthrie*, 35 Ohio St. 672; *Craft v. McConoughy*, 79 Ill. 346; *Hannah v. Fife*, 27 Mich. 172; *Alger v. Thacher*, 19 Pick. 51.

4. The following propositions are summarized from the opinion of Chief Justice SHERWOOD:

   *a*—Monopoly in trade or in any kind of business in this country is odious to our form of government. It is sometimes permitted to aid the government in carrying on a great public enterprise, or public work under governmental control, in the interest of the public. Its tendency is, however, destructive of free institutions, and repugnant to the instincts of a free people, and contrary to the whole scope and spirit of the federal Constitution, and is not allowed to exist under express provision in several of our state constitutions.

*b*—It is doubtful if free government can long exist in a country where enormous amounts of money are allowed to be accumulated in the vaults of corporations, to be used at discretion in controlling the property and business of the country against the interest of the public and that of the people, for the personal gain and aggrandizement of a few individuals. It is always destructive of individual rights, and of that free competition which is the life of business, and it revives and perpetuates one of the great evils which it was the object of the framers of our form of 'government to eradicate and prevent. It is alike destructive to both individual enterprise and individual prosperity, whether conferred upon corporations or individuals, and therefore public policy is, and ought to be, as well as public sentiment, against it.

*c*—All combinations among persons or corporations for the purpose of raising or controlling the prices of merchandise, or any of the necessaries of life, are monopolies, and intolerable, and ought to receive the condemnation of all courts.

Appeal from Wayne. (Gartner, J.) Argued June 13, 1889. Decided November 15, 1889.

Bill to enjoin defendants from selling stock in a manufacturing corporation, held by them as security. Defendants appeal from decree directing retransfer of stock to complainant, and that defendants pay a balance of $35,219.25 found due complainant. Decree reversed and bill dismissed. The facts are stated in the opinion.

*Willard M. Lillibridge* (*F. A. Baker*, of counsel), for complainant.

*Henry A. Harmon* (*Ashley Pond*, of counsel), for defendants.

SHERWOOD, C. J. In 1879 the Richardson Match Company was located at Detroit. It was organized under the laws of this State, and the complainant owned or controlled all of its stock. Its business was manufacturing matches, but for 16 months previous to July 3, 1879, its factory had not been in operation. The capital stock

of the company then was $75,000, consisting of 3,000 shares of $25 each. On the representations of the complainant to defendant Buhl as to the earning capacity of the match factory, the defendants became security for complainant on his bond to the government for $80,000, and indorsed the commercial paper of the company to the amount of about $50,000. To secure the defendants on these liabilities Mr. Richardson assigned to defendant Buhl 1,800 shares of the stock in the Richardson Match Company, and received from him therefor the following receipt and agreement:

"Received of Mr. D. M. Richardson one thousand eight hundred shares of the stock of the Richardson Match Company, to be held by me for three years from July 1, 1879, as trustee, for the following purposes:

"1. To vote the same at all stockholders' meetings, both regular and special.

"2. To receive the dividends paid thereon, and retain the same, except one-sixth portion thereof, which I am to pay to D. M. Richardson.

"At the expiration of said three years, if all the obligations which I or R. A. Alger have assumed for said company are fully paid and satisfied, I am to transfer said stock to said D. M. Richardson.

"Detroit, July 3, 1879. C. H. BUHL."

The 1,800 shares of stock thus assigned to Buhl gave him and Alger control of the Richardson Match Company, and the agreement that they should retain five-sixths of the dividends made upon that stock gave them one-half of all the dividends or profits earned by the company. After the receipt was given, Gen. Alger became president of the company and a director, and Mr. Buhl and two of his sons, with Mr. Richardson, were the other directors. Frank Buhl, one of the sons, was made secretary and treasurer, at a salary of $1,200 per year. The Richardson Match Company was conducted under

the arrangement above stated until December 24, 1880. The paper indorsed by Buhl and Alger was discounted at 7 per cent. at the Detroit National Bank, in which they were interested, and the interest paid by the company in its ordinary course of business.

The Diamond Match Company was organized December 3, 1880, under the laws of the state of Connecticut, for the purpose of uniting in one corporation all the match manufactories in the United States. Its object was to monopolize and control the business of making all the friction matches in the country, and establish the price thereof; and it became necessary to buy many plants which had become established in the business, or were preparing therefor, and all the property used in connection therewith, and to obtain promises from the owners and manufacturers that they would not engage in the business themselves, or indirectly, through others, for ten or more years thereafter; and, for the purpose of obtaining the control and good-will of such factories and their properties, large powers were given by the legislature to the Diamond Match Company when organized, and under the by-laws by which it was controlled. The extent to which it was allowed to go in this direction in the accomplishment of its purposes appears in the articles of incorporation, in which it is stated, among other things, that the business of the company is—

"To manufacture, buy, sell, and deal in friction matches of all kinds, and all articles entering into the composition and manufacture thereof; to manufacture, buy, sell, and deal in machines and machinery, whether applicable to the manufacture of friction matches or to other purposes; to purchase, own, and sell exclusive rights under letters patent relating to the manufacture of friction matches, and to machines and machinery, whether applicable to the manufacture of friction matches or to other purposes; to manufacture, buy, sell, and deal in animal pokes, tobacco pipes, curry combs, brushes,

shoe-blacking, and shoe-dressing, and all articles entering
into the composition and manufacture thereof; to pur-
chase, own, and sell exclusive rights under letters patent
relating to the manufacture of all the articles herein
enumerated, and to machines and machinery applicable
to the manufacture thereof; to buy, sell, own, and deal
in any real or personal property necessary or convenient
to the prosecution of said business,—and generally to do
all things incidental to said business, and the proper
management thereof."

The Diamond Match Company, in carrying out its pur-
poses, found it necessary, in many instances, to buy a
large quantity of useless material, and to pay large and
exorbitant prices for the property purchased, which they
could not make available; and in many cases in no other
way was it possible to purchase the inactivity of manu-
facturers, and those who intended to enter into the busi-
ness, and who would otherwise become competitors of the
company in the trade.   For the purpose of showing upon
the books of the company the amount it was obliged to
pay for unnecessary and useless property, and the excess
in prices for the property they could use, to silence and
prevent all competition, the company opened two accounts,
—one headed "Real Estate and Machinery," and the
other "Purchase Account."   The capital stock of the
company consisted of $2,250,000, divided into $1,400,000
of common stock, and $850,000 of preferred stock.   For
five years the preferred stock was entitled to an annual
dividend of 10 per cent. before any dividend was to be paid
on the common stock.

All corporations and individuals in the country, engaged
in the business of making friction matches, desiring or
consenting to transfer their property to the Diamond
Match Company, did so upon valuations agreed upon,
and received their pay therefor in the stock of the
Diamond Match Company at par, and gave a bond to the
company of the tenor and effect of that given by the

Richardson Match Company when it entered the company, a copy of the condition of which reads as follows:

"And the Richardson Match Co. hereby covenant and agree to and with the said The Diamond Match Company, that it shall not and will not at any time or times, within twenty years from the date hereof, directly or indirectly engage in the manufacture or sale of friction matches, and that it will not aid, assist, or encourage any one else in said business, in the State of Michigan or anywhere else, where its doing so may conflict with the business and interests, or diminish the sales, or lessen the profits, of the Diamond Match Co.; and it is understood by it that the above covenant not to engage in the match business is a valuable and influencing consideration, without which the Diamond Match Company would not have purchased the above property; and for the true and faithful performance of said covenant it hereby binds itself, its successors and assigns, heirs, executors, and administrators, unto the said The Diamond Match Company in the sum of fifty thousand dollars, to be recovered and paid as and for liquidated damages."

Mr. Richardson's individual bond is in substantially the same form, in a penalty of $25,000.

Each proprietor subscribed for a certain amount of preferred stock, which he paid for by transferring to the company such matches and match materials as he or it had on hand when they entered the company, at an appraised value, and, if this was insufficient to pay for such stock, the balance was paid in cash; but common stock was paid for all real estate, machinery, patents, good-will, bonds to stay out of the business, and all other property transferred to the company at the valuation agreed upon when the proprietor or proprietors came into the company, except matches and match materials, for which preferred stock was issued. Under the arrangement by which any party sold and conveyed a match factory or other property to the company, he was to buy at its par value one-half as much preferred stock as he

had received in common stock for his property. This was intended as the working capital for the new company, and every person who conveyed property to the company was obliged to give to the company a bond, such as is hereinbefore mentioned. Under the policy above stated, through the energy of its officers and managers, the Diamond Match Company succeeded in securing control, substantially, of all the factories in the country, with their several properties, and the owners thereof were brought under its dictation, and the great monopoly became complete, and, as was expected by its proprietors, the gains realized by the company were enormous.

Schedule A of the testimony shows that among the match factories that passed into the control of the Diamond Match Company at the time of its organization was that of the Richardson Match Company of Detroit, and at that time the agreement of July 3, 1879, between Richardson and Buhl, hereinbefore referred to, was in full force, as was the bond to the United States, and the liability of defendants, as Richardson's indorsers, was also in existence. One was for $60,000, and the other about $30,000 or $35,000, and as security against the payment of which defendants held 1,800 shares of the Richardson Match Company's stock; and, as further security, the company had been re-organized, and its management and control placed under the direction of the defendants, as hereinbefore stated, and which was successful. Its earnings after its re-organization were $29,675.39, and no dividends were declared, and it is conceded the defendants are entitled to $14,837.69 of these earnings; and it further appears that the defendants have never been called upon to pay anything on account of their said liability for the complainant, or the Richardson Match Company. This was the situation of the Richardson Match Company, and Mr. Richardson, who had been in

its employ since its re-organization, as general manager, at the time the Diamond Match Company was formed. It was, however, necessary, in consequence of the uncan-celed liabilities of the defendants, and the desire of Mr. Richardson to raise more money to take the position he wished to in the new company, that a different agreement should be made from that of July 3, 1879, and that it should be between the complainant and defendants, and consummated before the Richardson Match Company became finally merged in the Diamond Match Company; and for this purpose Mr. Richardson, on November 22, 1880, submitted to the defendants the following proposition:

"DETROIT, MICH., Nov. 22, 1880.

"MESSRS. BUHL & ALGER:

"Proposition to me is as follows, viz.:

"*First.* To terminate the existing contract on the first day of January next, and to divide the net earnings on the basis of an inventory to be taken at that time, and to receive the dividend therefor

"*Second.* To indorse my notes for the necessary amount to purchase $100,000 of the preferred stock of the proposed new company, or so much thereof as shall be equal to 50 per cent. of the value of the factory, after deducting my share of the net earnings, allowance to be made for the payment of my personal debts. Their inter-est in the earnings of said stock to cease on July 1, 1882, provided said notes shall have been paid from the divi-dends upon said stock, or otherwise, on or before said July 1, 1882; the dividends received upon said stock to be applied to the payment of said notes. Said Buhl and Alger to receive one-half the dividends on the common and preferred stock of said company up to said July 1, 1882, at the time of final settlement: Provided, however, that in the event that no inventory of the assets and debts of the proposed new company shall be made on July 1, 1882, then the basis of settlement shall be as fol-lows: Said Buhl and Alger shall receive one-quarter of the dividends made for the year 1882, and one-half the dividends for 1881, after deducting therefrom the

amount paid for interest on the mortgage on the factory property, and upon the notes so indorsed. The common and preferred stock to be assigned to Mr. C. H. Buhl, except $30,000, which is to be assigned to said proposed new company as collateral security for the payment of the mortgages on the factory, and a further sum of $5,000 to be held by me.

. " *Third*. In the event said notes shall not have been paid, and the debt duly liquidated, on or before July 1, 1882, said Buhl and Alger shall receive one-half the dividends for the full term of two years from January 1, 1881, to January 1, 1883, after deducting from the total dividends of said company the interest on said mortgages and said notes. Upon settlement being made under the second or the third proposition, as herein stated, [said stock] shall be reconveyed to me."

This proposition was accepted, with the following addition, made by Gen. Alger, and which was assented to by Mr. Richardson:

" If, upon the expiration of two years from January 1, 1881, said notes are not paid, then Buhl and Alger are authorized to sell the necessary amount of stock to pay for the same, unless some further arrangement for carrying them along is agreed upon between them and myself."

Mr. Richardson testifies that, upon the basis of the contract contained in the foregoing proposition, as modified by Gen. Alger's addition thereto, he attended the meeting for the organization of the Diamond Match Company, and put into the new company the factory of the Richardson Match Company, at the sum of $190,000, and subscribed for $95,000 of the preferred stock. The $190,000 for the factory was paid for in common stock. The defendants gave their indorsements to the amount of $35,000 to enable the complainant to pay for his preferred stock, which he paid into the Diamond Match Company. The contract, as modified by Gen. Alger, had not yet been signed by the parties. At the general's

suggestion, a meeting of the parties was had on Decem_
ber 27, 1880, in Detroit, at which Gen. Alger proposed
that an additional clause should be made to the modified
contract.   Mr.  Richardson  objected  to  the  proposed
change, but to which, he claims, under the then situa-
tion and circumstances, he was finally compelled to yield
his assent, and the contract, as finally concluded, reads
as follows:

"Memorandum of agreement between David M. Rich-
ardson, of the first part, and Christian H. Buhl and
Russel A. Alger, of the second part, all of Detroit,
Michigan, witnesseth as follows:

" *Whereas*, it is deemed expedient to wind up the
business of the Richardson Match Company, and to unite
its interests with the other match manufacturing inter-
ests in the United States in one corporation, to be known
as the ' Diamond Match Company,' organized under the
laws of Connecticut; and—

" *Whereas*, said Richardson desires to furnish ninety-
five thousand dollars toward the necessary working cap-
ital of said Diamond Match Company, and also to sell
his factory, and the machinery connected with same, to
said Diamond Match Company:

"Now, therefore, for the purpose of making such con-
solidation, the parties hereto consent that the lands,
buildings, machinery, tools, and fixtures of the Richard-
son Match Company be sold and conveyed to the said
Diamond Match Company for the sum of one hundred
and ninety thousand dollars ($190,000), to be paid for in
the common stock of said Diamond Match Company at
its par value.   And as it will be necessary for said Rich-
ardson to borrow the principal part of said ninety-five
thousand dollars, for which he is to receive ninety-five
thousand dollars of the preferred stock of said Diamond
Match Company at its par value, the said second parties
agree to indorse the said Richardson's notes for such sum
as is required to make up said ninety-five thousand
dollars ($95,000), after deducting the amount of the net
earnings due said Richardson from the proceeds of the
Richardson Match Company since July 1, 1879, and to
raise the money on said notes.

" An inventory of all the matches and match materials of the said Richardson Match Company on hand January 1, 1881, shall be made, and such property sold. The inventory and valuation of said personal property, upon which the same is sold, shall be the basis of settlement between the parties in the division of the profits of the Richardson Match Company. The first party is to assume the payment of the principal and interest of a mortgage on the property of the Richardson Match Company for $28,200, held by the Connecticut Mutual Life Insurance Company, and is to deposit with said Diamond Match Company $40,000 of said common stock, at its par value, as security for such payment. All the remaining stock, both preferred and common, is to be taken in the name of the first party, and, with the exception of ten shares of said common stock, is to be immediately transferred by him to said C. H. Buhl, to be held by said Buhl as security for the indorsements as above stated, and any and all other indebtedness of said first party or said Richardson Match Company to said parties, or either of them, and also as security to said second parties for their interest in the profits upon the said stock of the Diamond Match Company.

"The debts due to the said Richardson Match Company are to be collected, and its indebtedness paid. A settlement is to be made between the parties hereto, and the profits divided, as provided in the agreement of July 3, 1879, except that the share of the profits belonging to said first party shall be applied to the payment of his debt to the Richardson Match Company, and in payment of any moneys due from him to either of said second parties; and what remains shall be contributed by him as a part of said $95,000, and on the sum contributed he shall receive interest from the dividends paid on said stock.

"The dividends on the stock of the Diamond Match Company, both common and preferred, including the $40,000 pledged as aforesaid, and the 10 shares retained by said Richardson, for one year and six months from January 1, 1881, shall be applied—*first*, to the payment of interest on said mortgage to the Connecticut Mutual Life Insurance Company; *second*, to the payment of interest on the notes so indorsed ·by said second parties; and *third*, to the payment of interest to each of the parties

hereto on the money advanced by them respectively in making up said sum of $95,000. Of what there remains, one-quarter shall be paid to each of the said second parties, and the other half applied to the payment of the principal of the notes so indorsed by said second parties, and of any advances that may be made by them

"The said second parties agree that they will advance to said first party the dividends belonging to them as aforesaid, to be used in taking up said notes indorsed by them, and take therefor the notes of said first party, payable on or before March 1, 1883, with interest at the rate of seven per cent. per annum, and hold said stock as security for the payment thereof. If all said notes indorsed by said second parties as aforesaid are not paid by September 1, 1882, then said second parties shall be entitled each to one-fourth of the dividends on all said stock for the whole of the year 1882. The notes to be given by said first party to said second parties for any cash that they may advance to make up said $95,000 shall bear interest at seven per cent. per annum, and be payable on or before September 1, 1882. If all of the notes indorsed by said second parties as aforesaid, and any notes given by said first party to said second parties, are not paid by March 1, 1883, the said second parties are hereby authorized to sell said stock at public auction after thirty days' published notice, and apply the proceeds, or so much thereof as may be required, to the payment of said notes, interest, and expenses; the above provisions to apply to all original notes and renewals thereof.

"*It is expressly understood that said second parties are to receive one-half (each one-quarter), after deducting the payments for interest as above stated, of the net earnings of said stock, and not merely one-half the dividends; and in settlement with said first party, he is to pay them, in addition to one-half the dividends declared, the one-half of any surplus or reserved fund which, if divided, would pertain to said stock; and on such settlement no loss that may be . charged on account of the purchase and sale by said Diamond Match Company of other match factories shall be taken into account; and, if such settlement is made at the end of a half-year, the earnings of the whole year shall be averaged so that the said second parties shall receive the full half of the earnings of said stock for the whole year. Provided, that on such settlement the second parties shall estimate such earnings from the trial balance or books of said*

*Diamond Match Company, and shall make such allowances
as to them shall seem just and equitable for loss and
shrinkage in values of said Diamond Match Company, and
shall take into consideration improvements that have been
made out of the earnings thereof.*

> "DAVID M. RICHARDSON.
> "R. A. ALGER.
> "C. H. BUHL.

*"Detroit, Dec. 28  1880."*

That portion of this contract printed in italics is the
clause added at the suggestion of Gen. Alger, and objected
to by Mr. Richardson.    In other respects, the agreement
is substantially the same as that agreed upon in Richard-
son's proposition, dated November 22, 1880.

A supplementary agreement was entered into November
22, 1881, extending the contract of December 28, 1880,
so that it should cover the entire period of two years.
It is as follows:

"It is also agreed that the earnings of the stock of the
Diamond Match Company, both common and preferred,
including the $40,000 pledged to the Diamond Match
Company, and the ten shares held by said Richardson, for
two years after the first day of January, 1881, shall be
applied as stated in said agreement of December 28, 1880;
it being the intention hereof to provide that said second
parties shall each receive one-quarter of the earnings of
said stock for two years from January 1, 1881,—that is,
one-quarter of the full earnings of the stock for 1881 and
1882, instead of for one year and six months, as stated in
said agreement.    In all other respects, except providing
security for additional loans, as hereinbefore stated, said
agreement is to remain in force and unchanged."

It is conceded that the liability of the defendants for
the complainant upon their indorsements did not exceed
at any time $85,600, and that at the time of the com-
mencement of this suit such liability of defendants, both
upon such indorsements and upon the bond to the gov-
ernment, except a small note of $3,150, had been paid,
and that said note has since been satisfied, and that said

defendants have never been obliged to pay a dollar on account of such liability.

The Richardson stock, held by Buhl, in the Richardson Match Company was exchanged for stock in the Diamond Match Company, which took the place of the other. The dividends received on the Richardson stock amounted to $114,000, and the Richardson Match Company, when its business was closed up, showed profits to be divided of $29,675.39, or an aggregate of profits of $143,675.39. The interest paid on the mortgage on the Richardson match factory and on the paper indorsed amounted to $9,609.29, showing a net profit to be divided of $134,066, and leaving $67,033 to go to Buhl and Alger, and the same amount to Richardson. At the time the bill was filed Buhl and Alger had received $68,400, and since that time have received $24,400, making an aggregate of $92,800, or $25,767 more than one-half of the amount to be divided, as claimed by complainant. It is this last amount, with interest thereon, making a total of $35,319.25, for which complainant claimed and obtained at the circuit a decree, and from which defendants appeal. Complainant alleges that—

"The said sum of $68,400, so received by the said defendants, comprises the full one-half of all the net earnings of said stock so held by the defendant Buhl during the years 1881 and 1882, together with the amounts received as aforesaid by them from the net earnings of the stock of the Richardson Match Company; not charging against said stock any loss on account of the purchase and sale by said Diamond Match Company of other match factories. And your orator, upon like information and belief, avers that, during the said two years, the said stock has earned no surplus, and that there is no reserve fund which, if divided, would pertain to said stock, and that the said defendants have now received all that is due them upon the said stock, under the terms of the three contracts above referred to."

The foregoing allegations are denied by the defendants, and they allege that the net earnings of the Richardson stock in the Diamond Match Company for 1881 were $81,099.31, and for 1882 are $139,757.92; and that there is still due them on their share thereof $52,061.38, less the dividend of $24,400, received by them since the bill was filed. Thus it will be discovered that the issue in the case is made upon the proper construction of the contract of December 28, 1880, assuming that said contract is in all respects a valid instrument.

When the Diamond Match Company opened the books containing the account of its transactions, as has been hereinbefore alluded to, all of its purchases were kept in two accounts. Under the head of "Purchase Account," were matches and match material, appraised at cash value; and it would appear that under the head of "Real Estate and Machinery Account," everything else purchased by the company as taken and appraised was included. This account was represented by the common stock of the company, with which it was purchased; the other by preferred stock, which was given for it. There seems to be a general understanding that the property contained in the purchase account, or very much of it, was taken by the company at a large overvaluation, in some instances many times its worth was given; and it is claimed in like manner was there an overvaluation made and listed under the head of "Real Estate and Machinery Account;" that this became necessary in order to make the desired purchases, and secure the complete monopoly intended, that is to say, to increase the value of the company's stock and its gains by destroying all competition, whether the result of individual enterprise or corporate action, and to secure the non-action of the proprietors of the factories taken in or purchased. The

parties to this suit were all benefited by such action in proportion to the amount of stock held by each, as all were stockholders. It is true the complainant's stock, or a large portion of it, was at the time held by defendants as security, but that does not change the rules or the results which govern and follow the action taken by the company.

There appear in the record, as returned to this Court, from the books of the Diamond Match Company, commencing with August 1, 1881, 19 trial balances, ending with August 1, 1883. That of December 31, 1881, shows a credit to the profit and loss account of $647,433.43, and a debit of $7,175.67, leaving a balance to the credit of that account of $640,257.76. The trial balance of December 30, 1882, shows a credit to the profit and loss account of $1,118,848.42, and a debit of $15,496.29, leaving a balance to the credit of that account of $1,103,352.13. The board of directors, on February 9, 1882, adopted the following preamble and resolutions:

" *Whereas*, the several ledgers and general balance sheets of the company, at date of December 31, 1881, show the aggregate net earnings of all the factories earning a profit to be the sum of $647,433.43, and the aggregate losses of the factories making losses to be $7,175.67, making total net earnings, $640,257.76; and—

" *Whereas*, there are standing on the several ledgers of the company various purchase accounts, which are debited with an aggregate sum of $173,733.89, which represent the cost of same up to December 31, 1881; and whereas, the actual value of said purchase accounts is $5,500; therefore—

" *Resolved*, that the difference of $168,233.89 between the actual value and the book value of these purchase accounts be charged to Dr. of net earnings of the company for 1881, and that the president be instructed to furnish the managers with the proper forms of entries to carry this resolution into effect.

" *Whereas*, many of the real-estate and machinery accounts of this company have a book value, or are

charged with a cost sum in excess of their actual value; therefore, *resolved*, that $247,023.87 of the sum described as net earnings be applied to the reductions of the book values of such real-estate and machinery accounts, and in such proportions as the executive committee may approve, and that the president be requested to furnish the managers with the proper entries to carry this resolution into effect on the several books of account and ledgers of the company."

At the same meeting of the board of directors, a 10 per cent. dividend was declared. Three 10 per cent. dividends were declared for 1882; the last one at a meeting of the board February 14, 1883. At the same meeting it was resolved—

"That the balance remaining as credit of profit and loss account, after providing for the dividend declared at this meeting, be applied to the reduction of the book values of the company's real-estate and machinery accounts, such reduction to be apportioned among the several properties by the executive committee; the amount so to be applied being. $310,922.26."

Subsequently a reduction was made in the purchase account of $117,429.87. This fact is admitted by a stipulation of the parties, and by said stipulation the following is given as a tabulated statement of the action of the company's board of directors in disposing of the profit and loss account for the two years in question:

1881.

| | | |
|---|---:|---:|
| To the credit of profit and loss account | | $640,257 26 |
| Dividends | $225,000 00 | |
| Charged off purchase acct | 168,233 89 | |
| Charged off real estate and machinery acct | 247,023 87 | |
| | | $640,257 76 |

1882.

| | | |
|---|---:|---:|
| To the credit of profit and loss acct | | $1,103,352 13 |
| Dividends | $675,000 00 | |
| Charged off purchase acct | 117,429 87 | |
| Charged off real estate and machinery account | 310,922 26 | |
| | | $1,103,352 13 |

The defendants claim that they are entitled under their agreement to their share of the amounts charged off, the same as though these amounts had not been so disposed of upon the books. Complainant claims that defendants are entitled to one-half of the dividends paid, and no more; that dividends and net earnings mean the same thing, as used in the contract between the parties in this case; and that they have received the amount to which they are entitled.

It is undoubtedly true that—

" The function of a profit and loss account is to show earnings, or the lack of them; and that everything being credited which ought to be credited, and everything being charged which ought to be charged, the profit and loss account will show what the net earnings or net losses are;"—

And I am satisfied that the learned counsel for the complainant is correct when he says—

" That the first thing to be done by any manufacturer who would ascertain his net earnings during the preceding year, is to take a careful inventory of what he has left, including his plant and machinery, and then make just and full allowances for all losses and shrinkages of every kind that he has suffered in his property during the year, and for all expenses of every kind, ordinary or extraordinary, that have occurred during the year, and, having made such inventory, and deducted such losses and shrinkage of every kind, his net earnings will be the difference between all his investments in his business and all his expenses of every kind on the one hand, and this new inventory, with the reductions properly made, and all that he has received of every kind on the other hand; and if his books are properly kept, and proper deductions made, these net earnings will finally appear on the balance sheet to the credit of the profit and loss account."

There is no dispute as to what the items " charged off " in the account represented, and that they stood upon the books of the company, under the direction of

its managers, in the account as debited to the company. It represented the agreed valuation of the property purchased by the company, or taken into it at its organization, and for which common stock of the company was issued or given to the owner or owners, and included therein is the bond, required in each instance where a purchase was made, that the vendor would not prosecute the business for a series of years thereafter

The stock was taken at par, the amount of the valuation and the amount of the stock being equal, and the value of the stock was never less than when taken, and remained at par except when sold for more; and it is a little difficult to see why it ·should be said, so long as this was the case, that there was a loss to the company or a shrinkage in value. It is true the value of the chattel property and real estate conveyed to the company may have greatly depreciated; but at the same time the rights surrendered to the company by the owner under his bond might, in the mean time, have greatly appreciated. It seems quite certain that no means are shown, if any exist, by which such loss or depreciation could be made to appear to a board of directors or to any one else with any degree of certainty.

But in this case a different question arises. Alger and Buhl, as regards the complainant, and their rights under this contract, occupy the position of third parties, and their interests are not controlled by these relations to the company. The amount they were to receive for their indorsements in no way depended upon the discretionary power of the board of directors. The net profits of the company mentioned in the contract served only to fix the amount they were to receive for their indorsements of the complainant's commercial paper. He had their indorsements to the extent he desired, and greatly to his pecuniary advantage, as the record plainly shows.

Notwithstanding the success of the company's operations has given to the terms upon which he received the aid of defendants almost the appearance of extortionate requirements, however, the hazard of the venture very much modifies this appearance when it is considered that a failure of the enterprise might have resulted in great financial disaster to defendants.

No question is raised as to the validity of the contract between the parties, or upon its invalidity upon the ground of public policy, or for any other cause. It is treated by the parties on both sides as a valid instrument, to be construed and enforced by the Court as such, and no unwillingness is expressed by either side to abide the correct construction when ascertained; but it is claimed by complainant that, if the construction is to be given to it contended for by defendants' counsel, equity and good conscience will have been violated to an extent requiring the exercise of the restraining power of a court of chancery to prevent the injury and wrong, not intended by the defendants when the instrument was made, and which at that time was entirely unanticipated by complainant. But it must be recollected that the object to be accomplished by the re-organization of the enterprise was by all the parties the same; that the means to be resorted to in the accomplishment of the object desired, if successful, had no respect for the equitable or just rights of any person under other and different circumstances; and that the complainant, as well as the defendants, were active participants in the business of the company and its proceeds, seeking the accomplishment of the same object, and participated largely in adopting the means to be employed for that purpose; and if such object or means were reprehensible or inequitable, all the parties, the complainant as well as the defendants, are "under the same condemnation," and a court of equity will leave the parties,

when such is the case, where it finds them,—outside the rules of courts of justice, *"in pari delicto,"*—and they must settle their own grievances and unlawful transactions.

The fact in this case appears plainly that the amount promised the defendants, and for which defendants ask payment, was to enable the complainant to occupy a place in the company which would give him a better position to share in the profits of the monopoly equally with the defendants. If it were our duty to adjudicate the rights of these parties, we should, under the circumstances, give the same construction to the contract in question, and apply the same rules, we would to any other agreement where no equitable considerations are involved. There is nothing ambiguous in the language used, nor is the object intended obscure. It was to organize and put into operation one of the greatest monopolies of the age, or rather to aid in so doing.

This is not a case where the complainant, as a stockholder, is seeking to obtain profits or dividends wrongfully withheld from him, or applied by a board of directors to an improper purpose, and the same rules do not govern the question that would be raised upon such an issue; but the simple question in the case is, what should the parties be held to mean from the language they have used, and does the action taken by the board of directors in disposing of the earnings of the stock during the two years in question bind the defendants as to the amount they are entitled to receive under their contract. It is evident to me that it does not, but that the defendants, independent of such action, may go behind it if necessary, and show that there has been no shrinkage of values,—no losses sustained,—and just what the net earnings of the stock have been during the two years; except in case it becomes necessary to make esti-

mates of earnings of the stock, it must be made from the trial balances, as these appear upon the books of the company, and in which case the defendants are to make proper allowances for the loss and shrinkage of the company's property, and shall take into consideration improvements that have necessarily been made in the proper conduct of the business.

It is expressly stated in the agreement that the defendants were not to receive one-half of the dividends merely which might be declared, but one-half of the net earnings of the stock; and it is not stated in the contract how or by whom such net earnings are to be ascertained. That portion of the contract upon which the contest arises best speaks for itself, and I do not think there is any chance for two opinions upon the subject of its proper construction. It says:

"It is expressly understood that said second parties are to receive one-half (each one-quarter), after deducting the payments for interest as above stated, of the net earnings of said stock, and not merely one-half of the dividends; and in settlement with said first party he is to pay them, in addition to one-half the dividends declared, the one-half of any surplus or reserved fund which, if divided, would pertain to said stock; and on such settlement no loss that may be charged on account of the purchase and sale by said Diamond Match Company of other match factories shall be taken into account; and, if such settlement is made at the end of a half-year, the earnings of the whole year shall be averaged so that the said second parties shall receive the full half of the earnings of said stock for the whole year: Provided, that on such settlement the second parties shall estimate such earnings from the trial balance on books of said Diamond Match Company, and shall make such allowances as to them shall seem just and equitable for loss and shrinkage in values of said Diamond Match Company, and shall take into consideration improvements that have been made out of the earnings thereof."

A close inspection of this paragraph of the contract

very clearly discloses, I think, that in the settlement to be made between these parties it was expressly provided that in ascertaining the half of the net earnings of the stock, to which the defendants were entitled, no such "charging off" from such earnings was to be allowed; and I do not think, as is urged by complainant's counsel,—

"That, in the absence of bad faith or mistake, the action of the board of directors in reducing the amounts to the credit of the profit and loss accounts is conclusive upon the parties to this suit as to the amount of the earnings or profits to be divided between them;"—

And it is of no consequence whether their action in this regard can be impeached or not, if the defendants are not bound by the action of the board of directors. There is no doubt but that the Diamond Match Company in doing a legitimate business would have had the right to have the par value of its shares of stock maintained out of the profits or earnings of the company, and it was maintained; and for that purpose it was entirely unnecessary for its board of directors to direct any "charging off," as was done in this case. Its stock was not only at all times at par, but, as we have before said, largely above par, and has always been at a premium; and from its earnings the year after the agreement ended the complainant himself received a stock dividend amounting to $70,000.

If it were necessary, but little difficulty would be found, I think, in showing that the sums "charged off" were not properly expenses or losses in running the business of the company. I think the learned counsel for defendants was right in saying—

"It was an acquisition of the very property the company at the outset had determined to acquire, and was of more permanent value than if it had been invested in new

factories. The object of the company was to crush others, that it might be valuable. It did that, and expended out of its earnings for 1881 and 1882 $285,663.76, not as an expense of running the business, but for the purpose, and with the inevitable effect, of increasing its property. What was acquired with this money was none the less property because intangible. Every dollar thus expended added itself to the value of the business, and became a permanent part of it. Richardson owns $285,000 of the stock of this company (exclusive of $70,000 acquired by stock dividend from earnings of 1883), every dollar of which was permanently enhanched in value by these expenditures. * * * It was a permanent invest-ment. The company had determined to monopolize the business, and therefore the more perfect the monopoly became the more valuable its property became. Every factory it bought and closed, every patent it acquired, every good-will it purchased, every man it bought up, added to the value of its stock not only the amount paid, but from the very necessity of the case, very much more."

Of course, when the agreement between these parties now before us for construction was entered into, no one could certainly tell that the defendants would ever realize a dollar of profits from their venture, while their liabili-ties assumed were very large. It could not be known that the dividends would ever be sufficient even to pay the interest on the notes indorsed, or the mortgage of $28,200 covering the property which was their only secur-ity, and which was to be first paid before they could realize any thing by way of profit. The success of the enterprise was not altogether free from doubt. Upon this point, Richardson himself says in his testimony he con-sidered he was assuming a great risk in turning his factory into the Diamond Match Company. Such was the com-plexion of things at the time the contract was made, as viewed by him, and he had then had 25 years' experience in the business. If the parties could have known then what they know now, or could they have foreseen the

almost fabulous future pecuniary success of this company, the contract made would have been regarded as both unconscionable and oppressive. But in construing the instrument, if a valid one, the circumstances and surroundings under which it was made, should be taken into consideration. Neither mistake nor fraud is claimed to have been used by the parties, or either of them, at the time it was procured and entered into, and we are asked to treat it as valid and binding, and construe it accordingly; and in this respect, so far in the discussion, I have complied with counsels' request, and in so doing have been unable to take any view of the case which will sustain the decree made by the learned circuit judge.

But an examination of the record, and the character of the transactions out of which the contract grew, and the object intended to be accomplished by it, as I have found them, raise another, and far more important, question, and which it becomes the imperative duty of this Court to pass upon, whether raised by counsel or not.

When a contract is brought before us for construction and adjudication, its validity is necessarily involved, and it is usually the first point to which the attention of the Court is challenged by counsel; but in this case, when, upon the argument, attention was called to this feature of the case, it was allowed to pass by counsel upon both sides without discussion. I have therefore expressed my views of the case as presented by the parties, and will now pass to the question which it is not needful for counsel to present in order to secure the action of this Court in disposing of the same.

I think no one can read the contract in question, and fail to discover that considerations of public policy are largely involved. ·The intention of the agreement is to aid in securing the objects sought to be attained in the formation and organization of the Diamond Match Com-

pany. This object is openly and boldly avowed. Not only does this appear in its organization, and in the business it proposes to conduct, and in the modes and manner of carrying it on, but the testimony of Gen. Alger himself avers it, and settles its character beyond question. The organization is a manufacturing company. The business in which it is engaged is making friction matches. Its articles provide for the aggregation of an enormous amount of capital, sufficient to buy up and absorb all of that kind of business done in the United States and Canada, to prevent any other person or corporation from engaging in or carrying on the same, thereby preventing all competition in the sale of the article manufactured. This is the mode of conducting the business, and the manner of carrying it on.

The sole object of the corporation is to make money, by having it in its power to raise the price of the article, or diminish the quantity to be made and used, at its pleasure. Thus both the supply of the article and the price thereof are made to depend upon the action of a half dozen individuals, more or less, to satisfy their cupidity and avarice, who may happen to have the controlling interest in this corporation, an artificial person, governed by a single motive or purpose, which is to accumulate money regardless of the wants or necessities of over 60,000,000 of people. The article thus completely under their control, for the last 50 years has come to be regarded as one of necessity, not only in every household in the land, but one of daily use by almost every individual in the country. It is difficult to conceive of a monopoly which can affect a greater number of people, or one more extensive in its effect on the country, than that of the Diamond Match Company. It was to aid that company in its purposes, and in carrying out its object,

that the contract in this case was made between these parties, and which we are now asked to aid in enforcing. Monopoly in trade or in any kind of business in this country is odious to our form of government. It is sometimes permitted to aid the government in carrying on a great public enterprise, or public work under government control, in the interest of the public. Its tendency is, however, destructive of free institutions, and repugnant to the instincts of a free people, and contrary to the whole scope and spirit of the federal Constitution, and is not allowed to exist under express provision in several of our state constitutions.

Indeed, it is doubtful if free government can long exist in a country where such enormous amounts of money are allowed to be accumulated in the vaults of corporations, to be used at discretion in controlling the property and business of the country against the interest of the public and that of the people, for the personal gain and aggrandizement of a few individuals. It is always destructive of individual rights, and of that free competition which is the life of business, and it revives and perpetuates one of the great evils which it was the object of the framers of our form of government to eradicate and prevent. It is alike destructive to both individual enterprise and individual prosperity, whether conferred upon corporations or individuals, and therefore public policy is, and ought to be, as well as public sentiment, against it.

All combinations among persons or corporations for the purpose of raising or controlling the prices of merchandise, or any of the necessaries of life, are monopolies, and intolerable; and ought to receive the condemnation of all courts.

In my judgment, not only is the enterprise in which

the Diamond Match Company is engaged an unlawful one, but the contract in question in this case, being made to further its objects and purposes, is void upon the ground that it is against public policy.

The decree at the circuit should be reversed, and the complainant's bill dismissed, with costs.

CHAMPLIN, J. I concur with the Chief Justice in dismissing the bill of complaint, for reasons which render it unnecessary to discuss the merits of the controversy between the parties.

It appears from the testimony that the Diamond Match Company was organized for the purpose of controlling the manufacture and trade in matches in the United States and Canada. The object was to get all the manufacturers of matches in the United States to enter into a combination and agreement, by which the manufacture and output of all the match factories should be controlled by the Diamond Match Campany. Those manufacturers who would not enter into the scheme were to be bought out, those who proposed to engage in the business were to be bought off, and a strict watch was to be exercised to discover any person who proposed to engage in such business, that he might be prevented, if possible.

All who entered into the combination, and all who were bought off, were required to enter into bonds to the Diamond Match Company that they would not, directly or indirectly, engage in the manufacture or sale of friction matches, nor aid nor assist nor encourage any one else in said business, where, by doing so, it might conflict with the business interests, or diminish the sales, or lessen the profits, of the Diamond Match Company. These restrictions varied in individual cases as to the time it was to continue, from 10 to 20 years. Thirty-one manufacturers, being, substantially, all the factories where

matches were made in the United States, either went into the combination, or were purchased by the Diamond Match Company, and out of this number all were closed except about 13.

Gen. Alger was a witness in the case, and was asked by his counsel the following question:

"It appears that during the years 1881 and 1882 large sums of money were expended to keep men out of the match business, remove competition, buy machinery and patents, and in some instances purchase other match factories. I will ask you to state the reasons, if any there are, why those sums should not be treated as an expense of the business, and charged off from this account?"

To which he replied:

"Because the price of matches was kept up to correspond, so as to pay these expenses, and make large dividends above what could have been made had those factories been in the market to compete with the business."

It also appears from the testimony of Gen. Alger that the organization of the Diamond Match Company was in a measure due to his exertions. There is no doubt that all the parties to this suit were active participants in perfecting the combination called "The Diamond Match Company," and that the present dispute grows out of that transaction, and is the fruit of the scheme by which all competition in the manufacture of matches was stifled, opposition in the business crushed, and the whole business of the country in that line engrossed by the Diamond Match Company. Such a vast combination as has been entered into under the above name is a menace to the public. Its object and direct tendency is to prevent free and fair competition, and control prices throughout the national domain. It is no answer to say that this monopoly has in fact reduced the price of friction matches. That policy may have been necessary to crush competition. The fact exists that it rests in the discretion of

this company at any time to raise the price to an exorbitant degree. Such combinations have frequently been condemned by courts as unlawful, and against public policy. *Hooker v. Vandewater*, 4 Denio, 349; *Stanton v. Allen*, 5 Id. 434; *Coal Co. v. Coal Co.*, 68 Pa. St. 186; *Salt Co. v. Guthrie*, 35 Ohio St. 672; *Craft v. McConoughy*, 79 Ill. 346; *Hoffman v. Brooks*, 11 Week. Crim. Law Bul. 258; *Hannah v. Fife*, 27 Mich. 172; *Alger v. Thacher*, 19 Pick. 51.

It is also well settled that, if a contract be void as against public policy, the court will neither enforce it while executory, nor relieve a party from loss by having performed it in part. *Foote v. Emerson*, 10 Vt. 344; and see *Hanson v. Power*, 8 Dana, 91; *Pratt v. Adams*, 7 Paige, 616; *Piatt v. Oliver*, 1 McLean, 280, 2 Id. 277; *Stanton v. Allen*, 5 Denio, 434.

It is not necessary that the parties, or either of them, should rely upon the fact that the contract is one which it is against the policy of the law to enforce. Courts will take notice, of their own motion, of illegal contracts which come before them for adjudication, and will leave the parties where they have placed themselves.

CAMPBELL, J., concurred with CHAMPLIN, J.

LONG, J. I concur in the result reached by Mr. Justice SHERWOOD in this case. I am not, however, entirely satisfied with many of the reasons he gives for his conclusions.

It clearly appears that the defendants were never members of the Diamond Match Company, and never held a dollar of its stock, except by way of security for the loan of their credit to complainant. In 1879 D. M. Richardson was the head of a corporation, organized under the laws of this State, having a capital of $75,000, consisting of 3,000 shares at $25 each; but such was its financial

condition that for more than sixteen months prior to July 3, 1879, its doors were closed, and all operations suspended. In these straits complainant called upon defendant Buhl, and induced him, in conjunction with General Alger, on that date to indorse the commercial paper of the corporation to the amount of $50,000, and to become security on his government bond in the sum of $80,000. In order to be secured, defendants took 1,800 shares of the capital stock of the corporation, with a right to vote it at stockholders' meetings, to receive dividends thereon, paying one-sixth part of such dividends to complainant, and, at the expiration of three years, if all the obligations to defendants were paid, the whole of the stock held by defendants was to be transferred to complainant. Defendants, after this arrangement was made, gave their attention to the business, and it was carried on till December 24, 1880, under that arrangement. During this time, under the management of the defendants from July 3, 1879, to December 24, 1880, a period of a little over seventeen months, this corporation, whose doors had been closed for the prior sixteen months, had earned nearly $30,000.

On November 22, 1880, complainant made a written proposition to the defendants to modify and change, in a great measure, the agreement of July 3, 1879, which was agreed to by the defendants, after some additions were made at the instance of Gen. Alger. This proposition, and the amendment thereto, are set out in full in the opinion f Mr. Justice SHERWOOD, and need not be stated here. This new arrangement was not yet signed by the parties, and on December 27 1880, the parties met, and a contract was formulated, with certain other additions, which the parties finally all assented to and signed.

It appears that before this contract was finally agreed

upon and executed, and on December 3, 1880, the Diamond Match Company was organized under the laws of the state of Connecticut, and complainant desired to transfer the property and business of the Richardson Match Company to that, and to take its stock in payment therefor. In order to do this complainant was compelled to take one-half as much stock in the new company as his properties and business were placed at in the new company, and to pay cash therefor. The property and business were placed in the new company at $190,000, in shares of the new company's common stock, and complainant took $95,000 of the preferred shares. In order to raise this amount of money complainant again called upon the defendants to indorse notes to that amount, less the net earnings of the Richardson Match Company since July 3, 1879. The defendants agreed to advance to complainant the dividends belonging to them arising from the business of the Richardson Match Company, to be used in taking up the notes indorsed by them, and to take the notes of the complainant therefor, payable March 1, 1883, with interest at 7 per cent., and it was provided that all notes given to defendants by complainant to make up the $95,000 should draw interest at 7 per cent.

The Connecticut Mutual Life Insurance· Company held a mortgage of $28,200 on the properties of the Richardson Match Company. It was provided in the contract that, upon a transfer of these properties over to the Diamond Match Company, complainant should deposit with it $40,000 of the common stock to secure the payment of this mortgage, and that complainant should take all the balance of the stock, both common and preferred, in his own name, and at once indorse it over to defendant Buhl, to secure the defendants upon their indorsements, and their interest in the profits of the Diamond

Match Company. The contract also provided that, if these notes were not paid by March 1, 1883, defendants might sell these shares of stock at public auction, after thirty days' published notice, to meet such payments, interest, and expenses.

The rights and interests of the parties were then fixed by the contract in the following terms:

"It is expressly understood that said second parties are to receive one-half (each one-quarter), after deducting the payments for interest as above stated, of the net earnings of said stock, and not merely one-half the dividends; and in settlement with said first party, he is to pay them, in addition to one-half the dividends declared, the one-half of any surplus or reserved fund which, if divided, would pertain to said stock; and on such settlement no loss that may be charged on account of the purchase and sale by said Diamond Match Company of other match factories shall be taken into account; and, if such settlement is made at the end of a half year, the earnings of the whole year shall be averaged so that the said second parties shall receive the full half of the earnings of said stock for the whole year: Provided, that on such settlement the second parties shall estimate such earnings from the trial balance or books of said Diamond Match Company, and shall make such allowances as to them shall seem just and equitable for loss and shrinkage in values of said Diamond Match Company, and shall take into consideration. improvements that have been made out of the earnings thereof."

This contract was executed on December 28, 1880, and the Richardson Match Company's properties and business transferred to the Diamond Match Company, and the stock transferred to Mr. Buhl, as the contract provided.

It is conceded that since the making of this contract the notes signed by defendants have been paid from dividends received from the Diamond Match Company. The whole contention, therefore, arises upon the construction of this portion of the contract referring to net profits, and the interest of defendants thereunder.

It appears that in the organization of the Diamond Match Company the various parties put in their plants and good-will of the business at exorbitant prices,—much more than they were actually worth,—and also gave a bond not to engage in similar business, for which they were paid large amounts in stock of the company. Upon an inventory of the property the following year, the properties were put in at their actual worth. The accounts of the company were kept upon the ledger under two general heads,—one real estate and machinery account, and the other purchase account. Under the new inventory large deficits appeared in these two accounts, and, under a resolution of the board of directors, sufficient of the earnings of the company were taken out and applied to make up these balances, and these accounts were charged off. Complainant claims that the balance to be divided among the stockholders after these deductions, and deductions for expenses, represented the net profits; and that defendants, under their contract with him, must share in this loss.

Defendants claim that they are entitled, under the agreement, to their share of the amounts charged off the same as though these amounts were not so disposed of by the board of directors upon the books. I think the defendants are correct in their interpretation of the contract. The contract is not ambiguous. It was entered into by all the parties understandingly, and no fraud or mistake is charged. The contract expressly provided that—

"On such settlement no loss that may be charged on account of the purchase and sale by said Diamond Match Company of other match factories shall be taken into account," etc.

Whatever the rights of the parties may be as between the complainant and the Diamond Match Company to

charge these amounts off, and apply the earnings of the company to such purpose, certainly the defendants could in no manner be bound by the action of the board of directors in that regard. They were not members of that company, and held the stock directly from the complainant by way of security for their indorsements, and for the payment of their claims, which were certainly and definitely fixed by the contract. The net earnings of the company, as mentioned in the contract, served only to fix the amount they were to receive.

The complainant states in his bill that the net earnings of the stock of said company, so held as security by defendants, including these amounts charged off applicable thereto, amounted, in the year 1881, to the sum of $81,099.31, and for the year 1882 amounted to $139,757.93. While these amounts are large, yet complainant gets one-half, and the defendants each one-quarter, by the terms of the contract. As is well stated by Mr. Justice SHERWOOD:

"Of course, when the agreement between these parties now before us for construction was entered into, no one could certainly tell that the defendants would ever realize a dollar of profits from their venture, while their liabilities assumed were very large. It could not be known that the dividends would ever be sufficient even to pay the interest on the notes indorsed, or the mortgage of $28,200 covering the property which was their only security, and which was to be first paid before they could realize anything by way of profit. The success of the enterprise was not altogether free from doubt. Upon this point, Richardson himself says in his testimony he considered he was assuming a great risk in turning his factory into the Diamond Match Company."

He took this risk, and the defendants shared it with him therein by the indorsement of his notes to nearly $85,000. They were together to get one-half of the net earnings for a certain definite period, after the payment

of these notes and mortgage. Complainant was then entitled to the whole stock, freed and unincumbered from any claims of defendants whatever, and the stock was to be assigned to him. The stock has made fabulous earnings, more than complainant or defendants could ever have anticipated or hoped. Complainant, as appears from this record, has reaped the benefits of defendants' financial standing and business abilities. The defendants found him with a plant stocked at $75,000, and his shop closed. They opened the doors, and put the machinery in motion, which, according to complainant's statement, has an earning capacity of more than $100,000 annually, and made the complainant the owner and possessor of $190,000 of the common stock and $95,000 of the preferred shares fully paid for.

It would seem that one ought to be satisfied with such results, and be willing that those who have carried the burden, and upon whom the loss would fall if disaster overtook the enterprise, should share in the profits when crowned with success, especially when the rights, duties, and obligations of the parties are fixed with so much certainty as appears by this contract.

Complainant's bill is entirely devoid of equity, and there is nothing appearing in the record showing that defendants have not treated the complainant in the most honorable manner, and under the true interpretation of the contract.

Whether the organization of the Diamond Match Company is one against public policy, I do not propose to discuss. Defendants are not members of the company, nor have they ever been. They claim the right to sell and dispose of this stock so held by them as security; and to realize therefrom the amount then due under the contract. By the terms of the contract they have the right to pursue this course.

By the decree of the court below they were restrained from making this sale. I agree with Mr. Justice SHER-WOOD that the decree of the court below be dismissed, with costs.

MORSE, J., did not sit.