DETROIT SALT CO. *v.* NATIONAL SALT CO.[1]

1. ILLEGAL CONTRACTS—ENFORCEMENT.

   The law will not aid one by enforcing an illegal contract, notwithstanding defendant is the more culpable.

2. CONTRACTS—VALIDITY—ANTI-TRUST LAWS—EVIDENCE.

   In determining whether a written contract is unlawful, as being in restraint of trade and in violation of the anti-trust laws, it is competent to show the circumstances attending the making of the contract, the object in view, and the construction placed upon it by the parties, as evidenced by their dealings under it.

3. SAME—QUESTION OF LAW.

   Though a contract is not illegal on its face, if all the evidence is consistent only with an unlawful purpose on the part of all the parties, the question of its illegality should not be submitted to the jury.

4. SAME—SALE—CONSTRUCTION—MONOPOLY—ILLEGALITY.

   Plaintiff agreed to sell to defendant all the salt it manufactured. The contract contained a provision whereby it was possible for defendant, upon payment of a certain sum as rental, to stop the manufacture of salt by plaintiff. Its president, who made the contract with defendant, knew that defendant controlled many other salt producers, and was engaged in an attempt to control the salt market through contracts with producers. He also assisted defendant in its attempt so to control the market. Prior to the making of the contract sued upon, the parties had prepared another contract, which was rejected because counsel advised that it was illegal. All the evidence was inconsistent with a legitimate sale of salt, except the denials of plaintiff's president, and these were qualified by the facts admitted. *Held*, that a verdict should have been directed for defendant, on the ground that the contract was illegal. GRANT, J., dissenting; being of opinion that there was sufficient evidence consistent with its legality to raise a question for the jury.

5. SAME—EVIDENCE—KNOWLEDGE OF CORPORATE OFFICERS.

   In such action it was competent to show, on the cross-examina-

---

[1] Rehearing denied October 12, 1903.

tion of plaintiff's president, that he knew that defendant was a monopoly, that it sought to control the market, and made contracts with other manufacturers, in order to refute plaintiff's claim that it was unaware of defendant's character and purpose. GRANT, J., dissenting.

Error to Wayne; Frazer, J. Submitted October 17, 1902. (Docket No. 84.) Decided July 14, 1903.

*Assumpsit* by the Detroit Salt Company against the National Salt Company for goods sold and delivered, and for stipulated damages. From a judgment for plaintiff, defendant brings error. Reversed.

*Thomas A. E. Weadock (John A. McKay*, of counsel), for appellant.

*Clark, Durfee & Allor (Gray & Gray*, of counsel), for appellee.

HOOKER, C. J. The plaintiff is a Michigan corporation; the defendant, a corporation organized under the laws of New Jersey. Both are engaged in the manufacture and sale of salt. The plaintiff has a plant at Detroit. This action is brought to recover the purchase price of a quantity of salt sold by the plaintiff to the defendant. The latter has appealed from a verdict and judgment of about $10,000. The recovery is based upon a written contract, which, though dated July 28, 1899, was executed in October of the same year. The principal defense is that the contract is in restraint of trade, and in violation of the anti-trust laws of the State and Nation, and therefore illegal and void. We insert it in full:

"This agreement, made this twenty-eighth day of July, 1899, between the Detroit Salt Company, a corporation of Michigan, its successors or assigns, party of the first part, and the National Salt Company, a corporation of New Jersey, its successors or assigns, party of the second part,

" *Witnesseth:* That for and in consideration of the sum of one dollar ($1.00) and other valuable consideration, paid by the party of the second part to the party of the

first part, receipt of which is hereby acknowledged, the party of the first part hereby sells to the party of the second part their production of salt made at their works, situated on the line of the Wabash Railroad, in Wayne county, State of Michigan, for the term of five (5) years, commencing on the first day of October, 1899, upon the following terms and conditions:

"I. For the first 300,000 barrels of salt, of 280 lbs. each, delivered per annum, 33c for each and every 280 lbs. of No. 1 Medium salt, and 28c for each and every 280 lbs. of No. 2 Medium salt, delivered on warehouse floor of plant of party of first part. For any salt manufactured in excess of 300,000 barrels, price shall be fifteen (15c) per 280 lbs. of salt, delivered as aforesaid. Any dairy or table salt which may be required by the second party will be furnished by first party, within their capacity to produce same, at 45c per 280 lbs.

"II. Invoices for shipments shall be rendered promptly, and statements shall be rendered upon the last working day of each month for shipments made during that month. Payments therefor shall be made not later than the 15th day of the next month succeeding shipment for all invoices, except such invoices concerning which there may be a dispute as to quantity or quality; such invoices to be settled when adjustment has been agreed upon.

"III. Should party of the second part fail to remove salt hereby sold, in sufficient quantities so as to enable the party of the first part to run said plant to its full capacity, thereby necessitating the suspension of manufacture in all or any part of said plant, because of lack of storage room due to failure of party of second part to remove said salt, then, five days after due notice in writing to second party of such failure, the party of the second part shall pay to the party of the first part, as liquidated damages, the sum of 16c per 280 lbs. of salt not manufactured in consequence thereof, for a period of time not exceeding six months in the aggregate in any one year; and for any time exceeding six months in any one year (dating from the date of this agreement), the sum of 32c per barrel upon estimated capacity of said plant or any portion thereof that may be closed down in consequence of the failure of said party of the second part to remove salt as heretofore agreed. The capacity of said plant to be determined by taking 150 barrels of salt, of 280 lbs. each, as an average daily pro-

duction of each pan, and multiplying the same by the number of pans idle, not exceeding six, however, that being the number in said plant.

"IV. It is distinctly understood that the party of the first part makes no obligation to deliver a specific quantity of salt, but they do agree to deliver to the party of the second part their entire production, and their failure to do so shall be settled by liquidated damages to be paid the party of the second part by the party of the first part, of thirty-five thousand ($35,000) dollars per year.

"V. And the party of the first part does hereby license the party of the second part to the exclusive name as trade-mark, and to the organization, of the Detroit Salt Company, during the period of this contract.

"VI. Party of the second part hereby agrees to ship *via* Wabash Railroad the entire production of salt hereby purchased, providing the facilities furnished and the rate of freight made by the Wabash Railroad Company are as advantageous as those given by competitive lines, and the prevailing freight differential between Saginaw Valley points, Cleveland, and Detroit maintained. It is understood in this connection that any favorable privileges granted by the Wabash Railroad Company, and now enjoyed by the party of the first part, shall accrue to the advantage of the party of the second part.

"VII. The party of the first part agrees to assign all contracts for cooperage, specifically described in Exhibit A hereto attached, to the party of the second part, and to sell to the party of the second part all cooper stock, bags, and pockets that said party of the first part has on hand October 1st, at cost; also to sell all salt on hand on October 1st, at the same price as stated in paragraph one.

"VIII. In the event of the destruction of the plant belonging to the party of the first part, as a whole or in part, by fire or other cause, they shall have the privilege of rebuilding the same to its present capacity.

"It is understood that the price named herein is based upon the present price of fuel, which is $1.25 per ton for Pittsburg No. 8 coarse slack, and $1.10 per ton for Hocking coarse slack, f. o. b. Detroit. Any advance in same is to be borne by the party of the second part, and any decline to accrue to their benefit.

"In witness whereof, the parties hereto have caused these presents to be duly executed on their behalf, by their

respective officers, and their respective incorporated seals hereunto affixed.

[Signed]  "DETROIT SALT CO.,
[Seal.]  "By J. M. MULKEY, Pt.
"NATIONAL SALT CO.,
[Seal.]  "By A. S. WHITE, Prest.
"Attest:  JNO. ALVIN YOUNG."

The defendant claims that the trial judge should have directed a verdict in its favor, instead of leaving to the jury the question whether the contract was illegal and void. The important questions presented by the record are:

(1) Can we say that the contract is illegal upon its face?
(2) Can we say that it should be so construed, in the light of the undisputed circumstances attending its making, and the dealings under it?
(3) Was there error in the exclusion of answers to questions asked upon the cross-examination of the plaintiff's witnesses?
(4) Should we say that the verdict was so clearly at variance with the weight of evidence as to require a reversal?

1. Was the contract illegal upon its face? Counsel for the plaintiff insist that, upon its face, this writing provides for a lawful sale of plaintiff's salt, and contains no agreement that is in restraint of production or trade, or that in any way violates the provisions of the anti-trust laws. The contract provides for the sale of plaintiff's entire output of salt. The price to be paid was 33 cents a barrel up to 300,000 barrels per annum; and 15 cents per barrel for all in excess thereof, the salt to be delivered on the floor of plaintiff's warehouse. It was provided that, if plaintiff should sell any of its product to others, it should forfeit and pay to the defendant the sum of $35,000, and, if the defendant should interrupt the manufacture of salt by the plaintiff, it should pay to plaintiff, for its damages, 16 cents per barrel upon the average daily output for the preceding three months, for a period of not exceeding six months, and 32 cents a barrel after six months. The con-

tract contained "a license of the exclusive name of the plaintiff, as a trade mark, and the organization," and it provided that, in case of destruction of the plant by fire, the plaintiff might rebuild to its former capacity.

We can conceive of a *bona fide* desire on the part of the defendant to purchase plaintiff's salt to the extent of 300,000 barrels at 33 cents per barrel, and a willingness to take salt in excess of that amount, if it could buy such excess at a sufficiently reduced price. And we can understand how the plaintiff might be willing to make a radical reduction in price for such excess, for the sake of a satisfactory price for the first 300,000 barrels, and the assurance of a market for all that it might produce. On the other hand, we can understand that, if defendant's object was to reduce production, a contract by which it secured the right to purchase such excess at less than cost of production, especially when fortified by the right to exact a $35,000 penalty for selling to others, would pretty effectively prevent the manufacture of any excess. It would be as efficacious as an express agreement that plaintiff should reduce its output to 300,000 barrels, or that it should not increase its capacity beyond that amount.

With nothing upon the face of the agreement to show the capacity of the plant, or the value of salt, or the cost of its production, we cannot say that the bare contract of purchase at the prices named was an illegal contract; and, if that were all that this contract attempted to provide for, it would be clear that we could not declare the contract illegal upon its face, whatever we might be justified in saying when it should be viewed in the light of attending circumstances. We might think a difference of 50 per cent. on the price of such a staple commodity a radical cut to make if the parties expected free competition in the market, and be suspicious of the purpose of the parties; but this would not justify us in holding the contract illegal upon its face. This suspicion may justly be increased when we find that the parties have anticipated a breach of the contract by defendant whereby production

should be reduced, and made provisions under which the defendant might stop the manufacture, by allowing the floor to remain filled with its salt, for a given price per barrel on the capacity of the mill, which stoppage could practically be continued indefinitely at that price by clearing the floor once in six months.   There can be no question that the defendant could practically close up this plant under this contract.   Whether it could afford to do it on the basis of 16 cents a barrel we do not know, but we can conceive of a price that would be quite convincing that such action would be profitable.

When we take these provisions into consideration, with the somewhat peculiar agreement about the use of plaintiff's name and organization, the $35,000 penalty for selling to others, and the limitation on the capacity in case plaintiff should have occasion to rebuild, we think there is much upon the face of the contract to indicate that the parties had in contemplation the control of plaintiff's production.   But, conceding, though not deciding, that we should not hold this contract to be illegal upon its face, we will next consider the circumstances under which it was made, and see whether they throw such light upon the intention of the parties as to conclusively establish the illegality of this sale of salt.

2.   Were the surrounding circumstances such as to conclusively establish the illegality of the contract?   The testimony of Mr. Mulkey shows that, about the time of their negotiations, the National Salt Company controlled some plants in the Saginaw Valley and Manistee, and he knew that they were trying to get others, though he says that White "was pretty careful not to tell him what other contracts he had made."   He admitted that the purpose of making this contract was, in its inception, to lower the price of salt, because the Michigan Salt Association had sent salt into the territory of the National Salt Company and depressed its trade, and that company wanted to lease plaintiff's works, with a view to throwing salt on the market to injure the Michigan Salt Association, and

threatened to build large works and injure the plaintiff's business, unless it acceded to its proposal. He stated that, before the contract sued upon was made, he was willing to contract, for his company, that it should not sell any salt east of the Mississippi river, though he knew that the freight rates beyond that boundary were prohibitive, and he also knew that the National Salt Company controlled the market in New York and the Eastern States. He testified that he did not recollect any conversation to the effect that other plants were to be closed, to limit the production of salt, but that, this talk having covered a period of three months, there might have been, and probably was, conversation of that kind. Shall we believe this? Mulkey also testified that, for a period previous to the making of this contract, men engaged in the salt trade were in and out of his office, discussing the matter, and he knew that they were negotiating with the National Salt Company, and that Mr. White was the man who got the salt manufacturers together. He also knew by report what the National Salt Company was doing in the way of making other contracts; that it controlled the markets in New York and the Eastern States. On September 20, 1899, he wrote White that some Bay City men—McEwan and Rouse—wanted some information regarding arrangements he (White) had made with salt companies outside of the association, and would like to arrange matters with him, giving the amount of their production, and stating that he would probably hear from them. Letters between the parties show that Mulkey was getting options for the National Salt Company. This related to some plants west of the Mississippi river. As bearing upon the relations of the parties, we insert some of the correspondence:

Letter of January 6, 1900, Mulkey to White:

"I saw Mr. Mulvane in Chicago last week. He says they are going to build in Michigan. Better settle with them, if you can, on reasonable terms."

Letter of January 7, 1900, Mulkey to White:

"While we very much prefer running, we believe, under the circumstances, it would be well to close; but this, of course, is a matter for you to determine."

Letter of January 18, 1900, Mulkey to White:

"We were in hopes, when we became identified with your company in the purchase of stock, that we should be considered one of your company, and not some one who was trying to take advantage of you; but every point seems to be fought out as though we were simply pirates in the field. We have had repeated propositions made to us to start people going in the salt business, and propositions which would undoubtedly have made us good money; but we have discouraged everything all we could, as letters in our possession will show. In other words, we are doing our very best to live up to the spirit of our agreement, and we regret very much that these misunderstandings are coming up all of the time, and we feel that the matter must be settled now once for all, and we want them settled before this contract is ratified."

Letter of February 9, 1900, Mulkey to White:

"It seems to the writer that an effort should be made to stop the building of the plant at Port Huron. I understand that it is backed by Griggs and Cooper, of Duluth, and this might be on account of their not being able to get association salt to sell. This is a very strong concern, and has always been a menace to the business, and once they are in they will be in to stay. I am very much afraid that the policy being followed out here is going to build up several different manufacturers, which in the end will be worse for us than we will gain by our deal, as the fight will be all the longer when it does commence. We feel that every effort ought to be made to prevent the building of every plant possible. I should like to talk this matter over with you fully when you come out."

Letter of October 11, 1900, Mulkey to White:

"I had a long talk with Irvine & Wise today, and they were very much surprised to learn that our plant was shut down. I gave them a few facts, and I am satisfied it has put them to thinking; and, unless they are getting somebody to put up all the money, it may deter them from building. On this account, we think the closing might be of benefit in two ways."

Letter of November 12, 1900, White to Mulkey:

"I have no doubt these repairs were necessary, but I see no reason why you should consume the time in making repairs which we pay you for to curtail the production of salt."

Letter of December 22, 1900, Mulkey to White:

"We have been repeatedly solicited to enter combinations which were very alluring, but have stood aloof, as we felt that we wanted to do everything that we could to treat you fairly."

Letter of February 6, 1901, Mulkey to White:

"If this is closed up, we will then take up the mine matter, and, if Fuller and his crowd do not care to purchase it, we will be glad to join with you in an effort to purchase the other Kansas rock-salt mines, and amalgamate the three. It is simply a matter of a little work, and I believe something very nice could be brought out of it for a side issue in salt. I believe this is a wise thing for all of us, in view of the fact that our evaporated interests and rock-salt interests are likely to clash, and bring about an ill feeling, which we hope to avoid."

Letter of March 8, 1901, White to Mulkey:

"So far as your plant is concerned, I understand that it is your desire that we pay the dead rental, as provided in the contract, while it is closed, which, of course, we will do."'

Letter of March 11, 1901, Mulkey to White:

"You have a contract by which you can close us down for a certain sum of money."

Letter of March 13, 1901, White to Mulkey:

"If we cannot continue to do so, then there is but one course to pursue, and that is to ask you to shut down, and we will pay the dead rental provided for in the contract."

Letter of May 10, 1901, Mulkey to White:

"Your letter of the 8th inst. received. I have arranged to have the matter of selling salt taken up with Swift, and will advise you later of the result of my efforts.

"I should be glad if you could give me some informa-

tion as to what you think is the prospect for the National. I understand the United Railway are now running under a receiver. Of course, I do not know to what extent they are going to be in competition with you. I shall be glad if you can give me the situation in general, and, if you can, I will treat it confidentially. I presume I see more of the prospective competition here in Detroit than anywhere else, but, with the little plants that have been built, together with the Underwood and Swift, it would seem to me that competition is coming to life rather lively. As far as our company is concerned, we wish' you to understand that we desire to stand squarely with the National Salt Company, and, at any time we can be of service to you, we stand ready to do what we can."

Letter of June 15, 1901, Mulkey to White:

"I met Swift's confidential man, Mr. Gardner, today. I learned that they have material on the ground for building derricks for their wells at Detroit. I suggested to him the advisability of making some kind of a deal for their salt for five years. He said they had not gone so far but that they could stop, and wanted me to name him an f. o. b. price, Detroit. I am inclined to think a deal could be made with them, but it would necessarily be at a low price, they having gone so far as they have; but the question is, Would it not be better to sell them salt at cost rather than have them enter the field as a competitor? They would undoubtedly manufacture more than their requirements, and would market the surplus. Think this over, and, if I can do you any good in any way, I shall be glad to do so."

There was convincing evidence that Mulkey knew that the National Salt Company controlled the products of several, if not many, other salt producers, at Saginaw, Manistee, Ludington, and other places. This testimony seems to show that the National Salt Company was engaged in an attempt to get control of the salt market through contracts with producers, that it contemplated a limitation of production, and that the plaintiff not only knew it, but was willing to enter into contract relations to that end, at least so far as other plants were concerned. It knew of defendant's illegal methods, and it contracted to

sell its salt to it, and consented to provisions which plainly made it possible for defendant to curtail plaintiff's production upon terms provided by the contract, which were, presumably, mutually satisfactory. But there is still further evidence.

Plaintiff's brief admits (page 4) that about this time the National Salt Company began negotiating for the purchase of the Detroit Salt Company's plant, because the Michigan Salt Association had been invading its territory; so it proposed to injure the Michigan Association by selling salt in competition. We do not find anything in the nature of a contract to sell the plant, but a contract was drawn and dated July 28, 1899, and executed by both companies. It provided: *First.* That the National Salt Company should buy the salt produced by the Detroit Salt Company for five years, and pay, for the first 300,000 barrels, 33 cents for No. 1 and 28 cents for No. 2; any excess over 300,000 barrels should be 15 cents; all to be delivered on floor of Detroit Salt Company's warehouse. *Second.* Upon 60 days' notice in writing, the Detroit Salt Company should suspend manufacture for the period stated in the notice, not exceeding six months in any one year, and during such suspension it should receive, as rental, a sum equal to 16 cents a barrel on its previous average daily production for three months. *Third.* If the National Salt Company failed to remove the salt, it was to pay 16 cents per barrel on the preceding average daily production as compensation for salt not manufactured. *Fourth.* The Detroit Salt Company agreed not to increase the capacity of its plant. *Fifth.* It contained a provision for a penalty for failure to deliver to defendant all salt manufactured. *Sixth.* It licensed "exclusive name as trade mark and organization," etc. *Seventh.* It was further agreed that no stockholder should operate a factory or sell salt. It was executed by both companies, and ratified and assented to by the stockholders. Plaintiff admits that this contract was illegal, but only in two particulars: (1) The agreement to shut down; (2) the agreement of stockholders.

Being advised by counsel that this was illegal, the parties made further efforts to agree upon a contract.

Mr. Gray, plaintiff's counsel, prepared the contract upon which this action is based, but at what juncture does not clearly appear, as it was not executed until October, although dated July 28, 1899. Meantime, other contracts were made and executed. Exhibit 18, dated July 29th, was a lease of the plant for $35,000 rent. This also contained a promise binding the stockholders as before. It was signed by the parties. A supplemental contract, dated August 15th, was made and signed by the parties, referring to that of July 29th, which provided for many important modifications of said lease, which we need not discuss. But, as stated, in October the contract dated July 28th, drawn by counsel, was executed, upon the advice of counsel that it was a valid instrument. It is now treated by plaintiff as the contract, though there is reason to believe that the parties began business at once after the first contract was signed, under the oral, or preceding written, agreements, or both, viz., on or soon after July 28th. No reference is made to these other contracts in the new one, but it is inferable that they were superseded by the contract in suit, and they clearly show what the parties had in mind, and it is proper to inquire whether this last contract was not an attempt to put in legal form the provisions they had agreed upon, so far as possible, without showing their illegal design, leaving the illegal agreements to an oral understanding, or whether, on the other hand, these parties, on being informed that their proposed contract was illegal, abandoned an illegal and criminal enterprise altogether, and embarked upon a new and different and legal one, which contemplated no restraint of trade, or control of manufacture or price of product. These circumstances and contracts justify the inference that the National Salt Company undertook to get control of the sale of the plaintiff's output of salt, with such restriction upon such output as would prevent an excess of over 300,000 barrels. All of the contracts are

consistent with this theory, and it requires a degree of credulity that we do not possess to believe that the National Salt Company abandoned its cherished purpose, for which, we doubt not, it was organized, or that the plaintiff believed it did.

It is contended that the evidence shows that the plaintiff's president was innocent of any knowledge of an intent to control production or prices of salt. He testified repeatedly that all he wanted to do was to sell plaintiff's salt, and some hearsay evidence was given that he so protested at the time of the transaction, and the jury has been induced to so find, notwithstanding the overwhelming evidence that, to accomplish the sale of his salt, he was willing to make these contracts, to write the letters, to counsel the shutting down of existing plants, and to aid in preventing the starting of new ones. No one would doubt for a moment that the pursuit of gain through the manufacture and sale of salt is the ulterior object of all these parties, and has been in all that they have done; but that fact is entirely consistent with their intentional combination to accomplish it by unlawful means and through illegal contracts. All of these things are consistent with defendant's claim. They are not consistent with a simple contract for the legitimate purchase and sale of salt. They indicate a strenuous effort to accomplish something out of the ordinary; and a business man who should act in relation to this matter upon any other assumption than that these parties had combined to control the price and production of salt would, in our opinion, be wanting in business prudence and sagacity. It is clear that this was accomplished so far as it could be, and at the same time protect the respective parties from one another, which both parties seem to have deemed necessary.

A motion for new trial was made upon the ground of newly-discovered evidence, and in support of it several important letters were produced. The failure to produce them on the trial was explained in a way, and while we cannot criticise the learned circuit judge, who refused to

recognize this as a very strong reason for granting a new trial to defendant, whose officers must have had plenty of evidence in support of their claim at command, the letters are important, and if, as said in *Richardson* v. *Buhl*, 77 Mich. 632 (43 N. W. 1102, 6 L. R. A. 457), the courts should, of their own volition, take notice of illegal contracts, it was quite sufficient, in connection with the manifest disregard of the law by the jury, to warrant a new trial. These letters cannot be considered as a part of the evidence, but they still further corroborate the evidence already mentioned. On June 8, 1899, Mr. Mulkey, plaintiff's president, wrote a letter to White, defendant's president, in which he refers to negotiations with the association having ceased. We understand this to allude to the Michigan Salt Association, but we have no means of knowing what the nature of the negotiations was. This letter of June 8th suggested to White a proposition for a strong company to buy the coal-producing plants on the Detroit and St. Clair rivers (of which we understand plaintiff's plant to have been one) and at Ludington, and that this company buy the product from the sawmill manufacturers, and that the coal manufacturers could be the safety valve, and be *shut down* whenever necessary, and make their profits out of the sawmill people. His company was willing to join a company on that basis, but did not want to sell its plant and retire from business. He expressed a willingness to do some work in the way of securing options, and wanted the communication treated as confidential. He admitted that the supply of salt exceeded the demand, and that he knew that at that time the National Salt Company controlled only New York and the Eastern States. The letter is as follows:

"Detroit, Mich., 6–8–99.

"Mr. A. S. White,
    "Presdt. National Salt Co.,
        "New York.
    "*Dear Sir:* All negotiations with the association having ceased, what would you think of a proposition for a

strong company to buy the coal-producing plants on the Detroit and St. Clair rivers, and probably Skinner plant at Ludington, and this company buy the product of the sawmill manufacturers, either direct from the manufacturers or from the association itself? The coal manufacturers could be the safety valve, and be shut down whenever it was necessary, and make their profits out of the sawmill people. This might be done by organizing a new company, or the National might extend its wings this much farther. We would be willing to join a new company on this basis, or join with the National, if properly represented. We do not throw out the proposition with a view to sell our plant and retire from the business, as we would not want to do that.

"If you think anything of the proposition, I shall be glad to meet you some place, and talk the matter over with you, and I would be willing to do some work in the way of securing options on the property. The salt trade is very active here. We believe all is being sold that is being manufactured, although at ruinously low prices.

"Kindly treat my suggestions confidentially, as I do not care to have them go any further if you do not approve of the plan.                    Very truly yours,
                              "J. M. Mulkey."

On September 13, 1899, Mulkey wrote White:

                              "Chicago, Ill., Sept. 13, '99.

"*My Dear White:* I had a conference with the A., T. & S. F. R. R. today. They are in hearty sympathy with our movement, and, if we can control the salt outside of the Gould crowd, we will have this road at our backs. You must control the Morton plant, and the balance will be easy.

"I had a conversation today with Mr. Robins of the Hutchinson Packing Company, and they are extremely anxious to do anything, but they have given Mr. Morton (I think) an option for the purchase of their product. Is this for you? If so, advise me by wire at Hutchinson, as I do not wish to run counter to any of your agents. Mr. Robins said he would know in a week or ten days, and, if this party did not take the salt, he would figure with me. I will learn more of this in Hutchinson, probably.

"The Santa Fé people are extremely anxious for us to buy Barton out, as he has been in the way for years, and I'm satisfied we can have all the protection we heed.
                         "Very truly yours,
                              "J. M. Mulkey."

Again, on September 20, 1899, he wrote:

"Sterling, Kansas, Sept. 20, 1899.

"*My Dear White:* As I wired you, I am up against another Carter. When it came to the scratch, Barton brought up the fact that his brother was claiming an interest in his plant, though 'twas not of record, and in reality he was not entitled to anything. Upon investigation I find the brothers have been threatening each others' lives, and are at swords' points. My attorney said 'twould not do to accept title from the one without a release from the other, as the fact that both were in possession might make the title to the one hold good, notwithstanding it was not of record. So I have my attorney trying to get them together, with some show of success.

"Had a talk with Vincent, but did not dare to talk to him of going east with me till I know what we do here. I learn that he is suspicious that I am out here to represent the National Salt Co. He went to Topeka to consult Mulvane yesterday about it. Mulvane is just back from a month's outing in Mich., and knows of your negotiations. If Barton learns of my aims, the jig will be up.

"Truly yours, J. M. M."

It is said that the defendant chose to keep silent, and that its officers, who must have known the truth, sat in the court-room and did not testify. We have no occasion to palliate their conduct. A man who will enter upon a business of this sort in violation of law, thereby becoming a criminal under the law, would not be likely to take the witness stand, and would be likely to claim the benefit of his privilege if called. The defendant is entitled to no especial consideration. It has had plaintiff's salt, and has not paid for it. Doubtless this fact made the jury unwilling to permit it to escape payment, and led them to ignore the legal rule that the law should not aid one by enforcing an illegal contract. Doubtless they looked upon the promoter of such schemes as the more culpable, and sympathized with the manufacturer, who, perhaps under coercion, or threats, or the sense of danger of ruin, yielded and became a party to the scheme, either for profit or to avoid loss. We share this feeling, but the law recognizes no

distinction, and will not aid one against the other in enforcing or carrying out their illegal contract. The decisions of the courts are uniform, and, in view of the increased prevalence of such contracts and combinations, both Congress and the legislatures of most of the States have made them criminal. The federal statute (26 Stat. chap. 647) punishes by fine and imprisonment those who engage in the making or carrying out of any contract in restraint of trade or commerce between the States or with foreign nations. Our own statute (3 Comp. Laws, § 11377) declares illegal all contracts, agreements, understandings, and combinations entered into, or knowingly assented to, the purpose, object, or intent of which shall be to limit, control, or in any manner to restrict or regulate the amount of production or the quantity of any article to be raised or produced, or to enhance, control, or regulate the market price thereof, or in any manner to prevent or restrict free competition in the production or sale of any such article, and it punishes by fine and imprisonment every person who is a party to such transaction. We are not called upon to close our eyes to the prevailing business methods in these affairs, or to the business conditions which have shown the inadequacy of civil remedies, and led to the enactment of penal statutes to prevent illegal business transactions. It is obvious that, so long as combinations in restraint of trade are profitable, there will be found those whose desire for gain will overcome their reverence for law, and even lead them to dare the dangers of criminal prosecution; and it is not unreasonable to suppose that in their contracts they will endeavor to give the appearance of lawful transactions. In making this contract before us, the parties had difficulty in avoiding illegal provisions, and, if defendant is right about the case, the safeguards of the contract are to be found in the provisions contemplating its breach. In a question of this kind it is proper to show the circumstances attending the making of the contract, the object and purpose in view, and the construction placed upon it by the parties, as evi-.

denced by their dealings under it.   *Gregory* v. *Wendell,*
39 Mich. 337 (33 Am. Rep. 390), citing *Rumsey* v. *Berry,*
65 Me. 574; *Richardson* v. *Buhl,* 77 Mich. 661 (43 N.
W. 1102, 6 L. R. A. 457); *Gregory* v. *Wendell,* 40 Mich.
432.

It is contended that, when there is dispute and uncertainty as to the object, purpose, intent, and knowledge of
the parties to a contract not illegal upon its face, the question must go to the jury, and this is the rule.   See *De Mary*
v. *Burtenshaw's Estate,* 131 Mich. 326 (91 N. W. 647).
But, where all of the evidence is consistent only with an
unlawful object and purpose on the part of all parties to
the transaction, it is otherwise.   Such is this case, notwithstanding plaintiff's attempt to claim innocence by saying it was only attempting to sell its product, and its denial
of knowledge of defendant's purpose.   Unfortunately,
its denial is proved false by the statements of its officers
concerning what they did and knew, and, as already stated,
while its ulterior object was to sell its salt, it is clearly
proved that it was willing to do it through unlawful
means and relations.

We have, then, a contract containing provisions uncalled
for if this is a legitimate deal, but entirely consistent with
the exigencies of an unlawful one.   We have overwhelming and uncontradicted evidence of the character of
the defendant, and its unlawful purpose and business, to
which this and similar contracts were necessary, and to
the furthering of which they were adapted.   We think
there is abundant evidence that the plaintiff's officers
understood this, and were willing to lend themselves to
the furtherance of the scheme, and this is not contradicted,
unless Mulkey's denials are a contradiction, and these are
so qualified and explained by the facts which he admits as
to refute them.

3. Upon the cross-examination of plaintiff's president,
he was asked if he did not know that the National Salt
Company was a monopoly, and that it sought to control
the market, and that it made other contracts with salt

manufacturers, and his purpose in making this contract. It was competent to inquire fully into interviews and knowledge of the parties, to show the nature and purpose of the arrangement, to refute plaintiff's claim that it was unaware of defendant's character and purpose, and to show, by their dealings, the construction that the parties themselves placed on the contract.

We think that the circuit judge should have admitted the proof tending to show plaintiff's knowledge and participation, and that he should have directed a verdict for the defendant, upon the ground of plaintiff's complicity in an illegal and penal transaction.

The judgment is therefore reversed, and a new trial ordered.

MOORE and MONTGOMERY, JJ., concurred with HOOKER, C. J.

GRANT, J. (*dissenting*). Plaintiff is a Michigan corporation, engaged in the manufacture and sale of salt. Its plant is located in Wayne county. Its capacity was about 900 barrels per day. It had been engaged in the business for eight years. Its corporators were W. F. Mulkey, his two sons, John and Owen, and one Button. John was president, W. F. the vice-president, Owen secretary and treasurer, and Button the general superintendent.

The defendant is a corporation, organized in March, 1899, under the laws of the State of New Jersey; is engaged in the manufacture, purchase, and sale of salt, cooperage, etc., in the State of New York and other places. Its organizer was one Archibald S. White. Walter S. Eddy, of Saginaw, was its manager for Michigan, and Clarence M. Ireton was assistant manager. How many plants it owned does not appear, but it owned one in New York State, and subsequently acquired the ownership of at least one or more in Michigan.

In June, 1899, it began negotiations with the plaintiff for the purchase of its entire product, at a certain price

and for a certain period. White carried on the negotiations. Negotiations continued for some time; several contracts were drawn, and finally one was drawn, and submitted to the attorney for the plaintiff by Mr. Mulkey. The attorney informed him that it was void under the anti-trust law of Michigan, because it provided for closing down their plant upon receiving 60 days' notice from the National Salt Company to do so, that the stockholders of the Detroit Salt Company agreed not to engage in the manufacture of salt east of the Rocky mountains during the life of the contract, and that it agreed not to increase the capacity of its plant. These provisions were eliminated, and the contract which forms the basis of the present litigation was executed. It seems important to give this contract in full. It reads as follows:

" This agreement, made this twenty-eighth day of July, 1899, between the Detroit Salt Company, a corporation of Michigan, its successors or assigns, party of the first part, and the National Salt Company, a corporation of New Jersey, its successors or assigns, party of the second part,

" *Witnesseth:* That for and in consideration of the sum of one dollar ($1) and other valuable consideration, paid by the party of the second part to the party of the first part, receipt of which is hereby acknowledged, the party of the first part hereby sells to the party of the second part their production of salt made at their works, situated on the line of the Wabash Railroad, in Wayne county, State of Michigan, for the term of five (5) years, commencing on the first day of October, 1899, upon the following terms and conditions:

" I. For the first 300,000 barrels of salt, of 280 lbs. each, delivered per annum, 33c for each and every 280 lbs. of No. 1 Medium salt, and 28c for each and every 280 lbs. of No. 2 Medium salt, delivered on warehouse floor of plant of party of first part. For any salt manufactured in excess of 300,000 barrels, price shall be fifteen cents (15c) per 280 lbs. of salt, delivered as aforesaid. Any dairy or table salt which may be required by · second party will be furnished by first party, within their capacity to produce same, at 45c per 280 lbs.

"II. Invoices for shipments shall be rendered promptly, and statements shall be rendered upon the last working day of each month for shipments made during that month. Payments therefor shall be made not later than the 15th day of the next month succeeding shipment for all invoices, except such invoices concerning which there may be a dispute as to quantity or quality; such invoices to be settled when adjustment has been agreed upon.

"III. Should party of the second part fail to remove salt hereby sold, in sufficient quantities so as to enable the party of the first part to run said plant to its full capacity, thereby necessitating the suspension of manufacture in all or any part of said plant, because of lack of storage room due to failure of party of second part to remove said salt, then, five days after due notice in writing to second party of such failure, the party of the second part shall pay to the party of the first part, as liquidated damages, the sum of 16c per 280 lbs. of salt not manufactured in consequence thereof, for a period of time not exceeding six months in the aggregate in any one year; and for any time exceeding six months in any one year (dating from the date of this agreement), the sum of 32c per barrel upon estimated capacity of said plant or any portion thereof that may be closed down in consequence of the failure of said party of the second part to remove salt as heretofore agreed. The capacity of said plant to be determined by taking 150 barrels of salt, of 280 lbs. each, as an average daily production of each pan, and multiplying the same by the number of pans idle, not exceeding six, however, that being the number in said plant.

"IV. It is distinctly understood that the party of the first part makes no obligation to deliver a specific quantity of salt, but they do agree to deliver to the party of the second part their entire production, and their failure to do so shall be settled by liquidated damages to be paid the party of the second part by the party of the first part, of thirty-five thousand ($35,000) dollars per year.

"V. And the party of the first part does hereby license the party of the second part to the exclusive name as trade-mark, and to the organization, of the Detroit Salt Company, during the period of this contract.

"VI. Party of the second part hereby agrees to ship *via* Wabash Railroad the entire production of salt hereby purchased, providing the facilities furnished and the rate of freight made by the Wabash Railroad Company are as

advantageous as those given by competitive lines, and the prevailing freight differential between Saginaw Valley points, Cleveland, and Detroit maintained. It is understood in this connection that any favorable privileges granted by the Wabash Railroad Company, and now enjoyed by the party of the first part, shall accrue to the advantage of the party of the second part.

" VII. The party of the first part agrees to assign all contracts for cooperage, specifically described in Exhibit A hereto attached, to the party of the second part, and to sell to the party of the second part all cooper stock, bags, and pockets that said party of the first part has on hand October 1st, at cost; also to sell all salt on hand on October 1st, at the same price as stated in paragraph one.

"VIII. In the event of the destruction of the plant belonging to the party of the first part, as a whole or in part, by fire or other cause, they shall have the privilege of rebuilding the same to its present capacity.

" It is understood that the price named herein is based upon the present price of fuel, which is $1.25 per ton for Pittsburg No. 8 coarse slack, and $1.10 per ton for Hocking coarse slack, f. o. b. Detroit. Any advance in same is to be borne by the party of the second part, and any decline to accrue to their benefit."

The parties carried out the provisions of this contract until the 14th of March, 1901, when the warehouses of plaintiff were filled so that it was impossible for it to operate its plant. It thereupon served notice upon defendant that its warehouses were filled, and that, unless the salt was removed, it would be obliged to shut down. The salt was not removed, the plant was shut down, and so remained until the commencement of this suit. The defendant paid the stipulated damages up to July 15th. During that time it had removed some salt, for which it paid. On August 15, 1901, it failed to pay for the July shipment, or the stipulated damages, and on August 17th plaintiff commenced this suit by attachment, and levied on defendant's property, consisting of bags, cooperage, etc., at the plaintiff's works. The defendant gave a bond, and the property was released. With its plea of the general issue, defendant gave notice of certain alleged breaches of the contract.

The court instructed the jury as follows:

"The defendant does not deny that it entered into the contract, but sets up here, as a ground of defense, that this contract is entirely illegal; that the object of entering into this contract was to increase the price of salt; that in fact it was an agreement or understanding between the plaintiff and defendant, and that the result of this agreement or understanding was well known to the plaintiff and defendant both, that the result of this contract would be to increase the price of salt to the consumer, and that it was in violation of the laws of this State.

"Now, before proceeding further to discuss this case, or to charge you on this matter, I propose to call your attention to the provisions of the statute in this regard. The statute is as follows:

"'That a trust is a combination of capital, skill, or arts, by two or more persons, firms, partnerships, corporations, or associations of persons, or of any two or more of them, for either, any, or all of the following purposes:

"'1. To create or carry out restrictions in trade or commerce;

"'2. To limit or reduce the production, or increase or reduce the price, of merchandise, or any commodity;

"'3. To prevent competition in manufacturing, making, transportation, sale, or purchase of merchandise, produce, or any commodity;

"'4. To fix at any standard or figure, whereby its price to the public or consumer shall be in any manner controlled or established, any article or commodity of merchandise, produce, or commerce intended for sale, barter, use, or consumption in this State.' Act No. 255, Pub. Acts 1899, § 1.

"Now, if, gentlemen of the jury, the intent and purpose of the parties entering into this contract was to produce any of the results mentioned in the statute, and which I have enumerated to you by reading from it,—if this contract was for any of these purposes entered into between these parties, and both these parties knew it and understood it,—that contract would be absolutely void, and the plaintiff could not, in this case, recover for any breach of that contract; this contract could neither be enforced in a court of law, nobody could be compelled to perform it, neither could either party recover from the other any damages on account of a breach of that contract. It is claimed, I say, by the defendant in this case, that this was the object and aim of that contract, that the National

Salt Company was a large organization, doing business in various parts of the United States, and that, as such organization, it was its object and purpose to procure the outputs of other manufacturing establishments in the same line of business, so that it could manipulate or control the price at which the commodity produced by these companies should reach the consumer; and if you shall find that it was the object and purpose of the National Salt Company to bring about these results, and this contract was entered into, that was entered into, with that knowledge, and for the purpose of aiding them in the perpetuation of this result, then that knowledge or intent or purpose on the part of the plaintiff in this suit would be a participation in the results which the National Salt Company sought to accomplish; and, if they did this, it would be in violation of law, and, being in violation of law, would be absolutely void, as far as being a contract is concerned, and it could not be enforced, nor could anything be recovered for damages for the breach of such a contract.

"It is claimed on the part of the plaintiff that they entered into this contract with no such purpose, but that they entered into this contract for the purpose of selling their entire output of salt. They have a right to enter into a contract of that character; anybody has a right to sell the entire product of any manufacturing establishment that it may own, to anybody, at the best possible price they can get for it, and, if that is entered into simply for the purpose of disposing of their own goods at the most advantageous price they can obtain for them, it is not in any sense a violation of law. It is only a violation of law when the contract is entered into for the purpose of accomplishing certain results that will affect the rights of the general public, as far as the price is concerned, in obtaining that article in the open market. If, I say, they entered into this contract just simply for the purpose of selling their own goods, it would be a legal contract, and any breach of it by either party to it would be a subject that might be brought into court in the proper form of action, and for the breach of such a contract the parties might recover. But if this contract was entered into for the purpose of, and did have a tendency, or it was the object, to decrease the amount of this article produced, or to shut down the works, so that the article could not be produced, or by the shutting down of these works for any time, no

matter how long, it would in any way affect, and it was for the purpose of affecting, the general price of this commodity, it would be a violation of law, and would be void; and if it in any sense had this effect, or was entered into for this effect, and was fraudulent in any respect, it would so taint the whole contract as to make the whole contract void."

Plaintiff recovered verdict and judgment.

1. The instructions of the learned judge, above quoted, are based upon the decisions of this court. *Richardson v. Buhl*, 77 Mich. 632 (43 N. W. 1102, 6 L. R. A. 457); *Western Wooden-Ware Ass'n v. Starkey*, 84 Mich. 76 (47 N. W. 604, 11 L. R. A. 503, 22 Am. St. Rep. 686); and *Clark v. Needham*, 125 Mich. 84 (83 N. W. 1027, 51 L. R. A. 785, 84 Am. St. Rep. 559). In those decisions many authorities are cited sustaining the views therein expressed. There is no occasion here for a discussion of the principle or of the decisions governing contracts in restraint of trade, or to limit production, or to enhance prices. The sole contention of the learned counsel for the defendant is that the contract which forms the basis of this suit is conclusively shown by the evidence to be void under the statute of this State known as the anti-trust law, and void as well at the common law, as a combination in restraint of trade. They insist, therefore, that the court should have directed a verdict for the defendant.

The controversy is between two corporations. The commodity which was the subject of the contract is one of the necessaries of life, and is used in every household. The feeling among the people is very general and very strong against combinations of the character here alleged. Jurors would naturally find against a contract clearly designed to enhance prices and limit the output of one of the necessaries of life. The defendant was represented upon the trial by able attorneys. The instructions of the court were clear and explicit that contracts of the character which defendant alleged this to be are absolutely void, and that, if the jury found this one to be of that character, they must find for the defendant. There is

certainly no ground for saying that there would be a natural prejudice against the defendant, except that it may be said that persons do not look with favor upon a party who pleads his own turpitude, and his own intentional violation of law, as a defense to the violation of a contract he has solemnly made. The defense interposed a reason which, if true, would tend to remove all prejudice upon that ground, viz.: It is claimed that plaintiff first violated the contract. The circuit judge was of the opinion that there was a conflict of evidence for the jury to pass upon. The jury did pass upon it, and found that the contract was legal. This court is now asked to set aside this verdict and judgment because there is no evidence to sustain them. A verdict based upon no evidence would, under such circumstances, be, at least, very unusual. The position taken has forced upon us a careful examination of the evidence. This is not a proceeding on the part of the government by *quo warranto* to annul defendant's charter, nor a proceeding in equity, where it is the duty of the court to examine the evidence and render a decree or judgment in accordance with the preponderance of evidence. If there is any evidence which fairly tends to support the validity of this contract, the question belonged to the jury, and not to the judges.

In the main brief for the appellant no claim or intimation is made that any provision is void upon its face. In their supplemental brief they say:

"In paragraph 1 of the contract declared upon, plaintiff is to receive 33 cents per barrel for its salt in bulk up to 300,000 barrels annually, and for any over that amount it is to receive but 15 cents per barrel. Was not this provision a limitation upon production? Fifteen cents per barrel, from the evidence, appears to be a ruinously low price."

Three hundred thousand barrels was the full output of plaintiff's plant at the time. Whether the price was ruinously low would depend upon the cost of production. Counsel do not cite us to any testimony in the record to

show what it cost per barrel to produce the salt upon the warehouse floors of the plant. There is evidence that salt, about that time, was selling at $2 per ton in bulk. This court cannot take judicial notice that the price of salt was ruinously low. If the learned counsel intended to raise this point, it was incumbent upon them to give the court below, as well as this court, reliable proof of the cost of production. The mere fact that a price was fixed for the full output of the plant, and a lesser price for the amount produced in excess thereof, provided the company should see fit to enlarge its plant, is not evidence of an unlawful intent to limit the output. So far as the record shows, the profits, at the contract price, may have been very large. There is nothing unlawful in parties agreeing to pay so much per barrel, pound, or bushel for a certain amount of a product, and a less or greater price for that which is produced over that amount.

Counsel also state that the following provision renders the contract void:

"And the party of the first part does hereby license the party of the second part to the exclusive name as trademark, and to the organization, of the Detroit Salt Company, during the period of this contract."

Counsel say:

"A sale could be accomplished in a few lines. A sale could also be accomplished without the clause just quoted. We claim that the contract, construed by itself, provides for a combination of the capital, skill, and arts of the two corporations."

If this be true, is it unlawful for two corporations to combine their capital, skill, and arts? Is it unlawful for one producer to sell his product to another? Counsel do not argue what the above language, "the license to the organization of the Detroit Salt Company during the period of this contract," means. We think it a fair construction to say that it means that the defendant was entitled to the use of the organization of the company in making sales of the salt purchased and to be delivered

under the contract. It might be advantageous to the defendant to make such sales under the name and trade-mark of the organization of the plaintiff. We do not think it means that the defendant was entitled to take possession of the property and run the plant, or that the result was to place this foreign corporation in the place of the plaintiff in its relation to the laws of this State. The evidence discloses no attempt whatever upon the part of defendant to act upon this clause, whatever it may mean, except to use the trade-mark. Counsel insist that a provision like this was condemned in *State, ex rel. Attorney General,* v. *Standard Oil Co.,* 49 Ohio St. 137 (30 N. E. 279, 15 L. R. A. 145, 34 Am. St. Rep. 541). I have read the contracts in that case, and I find no provision whatever in them like this, and no similarity in the contracts involved in that case and this. The above statements, taken from the defendant's supplemental brief, are contained under the title "Analysis of the Evidence." Under the title "Argument," in the same brief, the questions are not discussed at all.

The contract provides for the sale to the defendant of all plaintiff's product for five years, at a price based upon the average price for the three years preceding its date, to be delivered in plaintiff's warehouse, payments for the product shipped to be made each month. It stipulates liquidated damages for violation of the contract by either of the parties. The law not only sanctions, but approves, such provisions, and it is not the province of courts to say whether the damages so stipulated are reasonable or unreasonable. If plaintiff violates the contract, it is to pay $35,000 per year. If defendant violates it, it shall pay 16 cents per barrel upon the capacity of the plant, estimated in the way therein provided, for the period of six months in any one year. There is nothing in these provisions indicating the purpose to enhance the prices or to limit production. These provisions were legitimate, and are no evidence of intent to evade the law. 1 Suth. Dam. § 279. The severe penalty attached to a violation of the contract

by either is very potent evidence of an intent to keep the plant running. It seems to me entirely clear, therefore, that this contract upon its face is legal, and can only be held void by evidence *aliunde* the contract. Before discussing this evidence, it may be well to state some of the principles governing cases of this character.

A manufacturer may sell his entire product to another manufacturer, or to any one willing to buy. Two or more individuals may consolidate their business, and two or more corporations may do likewise. It is only when done with intent to enhance prices or to limit the output, or some similar wrongful purpose, that it comes within the inhibition of the law. It is not enough to render the contract illegal that the defendant intended to accomplish such illegal purpose. Plaintiff may even have known that the defendant intended to get control of all the salt manufactories of the country, and thus enable it to fix prices and limit the output, but this would not be sufficient to prevent plaintiff from selling its product or its plant to it. Both must participate in the intent. In *Gregory* v. *Wendell*, 40 Mich. 437, Justice Cooley stated the legal proposition thus:

"Neither can any question exist that if one party to a transaction contemplates an actual purchase, or the other an actual sale, the transaction may be perfectly valid, irrespective of any illegal views or purposes that may have been indulged by the other."

The same rule governs here as that which governs transfers of property with intent to defraud creditors.

Plaintiff made its case by proving the contract, its violation by the defendant, and plaintiff's damage. This damage consisted of two elements: *First*, the salt which defendant had received and not paid for, and, *second*, the stipulated damages resulting from defendant's failure to remove the salt, in consequence of which plaintiff was compelled to shut down its plant. The *onus probandi* was upon the defendant to prove the illegality of the contract. When one sets up his own turpitude and fraud as

a defense to a contract he has deliberately made, it is certainly incumbent upon him to establish its illegality by clear proof.  Defendant's manager sat in the court-room during the progress of this trial.  He had knowledge of all the facts which, if the defense be true, would clearly establish the illegality of the contract.  Its president, White, who negotiated the contract, could have been produced.  Neither chose to testify.  Under such circumstances, the evidence is rightfully construed most strongly against the defendant.  A party litigant cannot claim the consideration of a court or jury when he sits by, with the knowledge of the facts locked up in his breast, and chooses not to disclose them for the guidance of the court and jury.

Defendant sought to establish the illegality of the contract by the cross-examination of plaintiff's witnesses, by their contracts previously prepared, by certain letters which passed between Mr. White, the defendant's president, and Mr. Mulkey, the plaintiff's president, and by the fact that the price of salt advanced afterwards.  No notice of this defense was given in the pleadings.  No such defense was intimated until the cross-examination of plaintiff's president.  The court at first ruled the defense to be inadmissible under the pleadings, but, when his attention was called to the ruling in *Richardson* v. *Buhl*, the defense was admitted.

One or more prior contracts had been prepared and signed by the officers of plaintiff and defendant.  They contained terms which rendered them void under the law, for the reasons above stated.  When the previous contract was submitted to plaintiff's attorney, he advised it that it was illegal, specifying the reasons.  The defendant's attorney, on cross-examination of plaintiff's officers, questioned them very searchingly as to the purpose, motives, and intent in executing this contract; and as well the previous contracts.  They testified that the sole purpose was to effect a sale of the product of their plant, that they had no other object in view, and that they did not intend any violation of the law.  Mr. Mulkey, plaintiff's presi-

dent, testified that it was the distinct understanding, when the contract was made, that their works should run continuously; that, when the contract was made, it was not entered into with the expectation of limiting the production of plaintiff's plant; that he never saw any contract made between the defendant and any other company, and did not know the contents of any, though he knew that they were seeking contracts. That it was understood that plaintiff's plant should be run to its full capacity appears from a letter of defendant's Michigan manager, dated November 8, 1899, in which he said:

"Our agreement with you is to keep you free of salt, so that your works can run to the full capacity, and to do this you must arrange to load more than one car of bulk salt per day."

None of plaintiff's stockholders owned any stock in the defendant company at the time. Some of them bought some afterwards in the open market, and subsequently sold it. There is nothing in this record to show that the plaintiff or its stockholders expected to profit in any other way than by a sale of the product of plaintiff's plant. Its attorney, W. J. Gray, of Detroit, advised the plaintiff that its prior contract was void, and he drew the one now in suit, and advised it that it was lawful. Mr. Gray's testimony as to what Mr. Mulkey then said is as follows:

"When I told Mr. Mulkey that this contract [the previous one] was illegal, he said that what he wanted to do was to sell his salt, and, if there was not anything objectionable in our laws to the making and selling of salt, he wanted me to draw him a contract which would permit him to do it in a lawful way. I accordingly redrafted those clauses so as to eliminate the features which, in my opinion, were objectionable to our laws, and the contract offered in evidence here, and the one which is sued upon, practically contained the changes which I suggested. Mr. Mulkey said he wanted to comply with the law, and he didn't want to make a contract which was against the law, and he came to me, so that I would let him make a contract which was all right under the law."

Mr. Mulkey testified as follows:

"I had no other purpose in making this contract with the National Salt Company than to sell my salt for the best price I could obtain.

"*Q.* Did you have anything to do with the management of or business of the National Salt Company in any way?

"*A.* No, sir; I had no connection with them; I had nothing to do, either at the time of making this contract or afterwards, with fixing the price that the National Salt Company should sell their salt for. We had no other purpose in putting the clause into the contract, referring to stipulated damages, other than to compensate us, by way of damage, if they did not remove their salt. It was no purpose of the Detroit Salt Company to raise, lower, or control the price of salt, in the future. It was no purpose of mine or the Detroit Salt Company. Mr. White did not inform me what he was doing in connection with other plants. I knew he was negotiating, but I had no knowledge how far along he was, or that he would succeed in making any. It was no concern of ours, one way or the other, so long as we got what they agreed to pay us."

At the date of the contract the price of salt was 45 cents per barrel. This price included the barrel, which cost about 18 cents. In a few months thereafter it reached 85 cents. It afterwards dropped to 70 cents, and then to 50 cents. Such fluctuations often occur in other commodities. Of itself, it is not conclusive that the purpose of the contract was to enhance the price. Plaintiff was not benefited by the advance; it received the same price for its product whether the market price went down or up.

There was no evidence to show how many salt companies there were in the United States. During the progress of the trial, counsel for defendant stated to the court that he could show that this contract (meaning, unquestionably, a similar one) was entered into by hundreds of other companies, not only in this State, but in almost all the States of the Union. The statement was not made good. Plaintiff's witnesses had no knowledge of the subject except by hearsay, and did not know to what extent any similar contracts were made by the defendant and

others.   The defendant introduced no proof on the subject, although its manager, Mr. Eddy, as above stated, was in the court-room during the trial, and Mr. White at its command.

That these parties signed an illegal contract is not conclusive evidence that they could not make a legal one, or that the subsequent contract entered into by them, valid upon its face, is illegal.   The contention on the part of the plaintiff is that the prior contracts were made in the belief that the propositions therein contained were legal, but that, as soon as it was advised they were illegal, they were abandoned.

The purchase of some of the stock of the defendant company in open market by some of the stockholders of the plaintiff company, after this contract was executed, is not conclusive, if it is any, evidence of a purpose to make an illegal contract.

I do not think it can be said, under this record, that there was no evidence to support the validity of this contract, and that its invalidity was established beyond question.   I deem it unnecessary to set forth in full the letters upon which the defendant very largely relies.   Of those introduced, five were written before the contract was executed, not one of which in terms refers to a contract between the parties.   Others were written after the contract was executed.   The letters to which some of them are replies are not produced.   Of those produced, some relate exclusively to the purchase of a salt property in Kansas, which Mr. Mulkey was evidently attempting to negotiate for Mr. White or his company.   Others show that Mr. Mulkey suggested to Mr. White the propriety of attempting to prevent the erection of certain proposed plants, and of buying producing plants on the Detroit and St. Clair rivers.   Mr. Mulkey was rigidly examined and re-examined on these letters, and his explanation thereof given to the jury.   They are not, in my judgment, conclusive.   Parties engaged in manufacture or business of any kind commit no legal wrong in attempting to prevent

the erection of competing plants.   Mr. Mulkey's efforts to assist Mr. White in securing the purchase or output of other plants do not *per se* stamp the contract between these two corporations as illegal and void.   All the letters, contracts, prior and subsequent acts, and the entire conduct and relations of the parties, were competent evidence to throw light upon the character of the contract.   The court gave full opportunity to the defendant to make good its defense, but it chose to throw no light upon the controversy by disclosing facts within its own knowledge.   I think the questions belonged to the jury, and not to the court, to determine.

2. On the cross-examination of Owen W. Mulkey, the secretary and treasurer of the plaintiff, he was asked, "Do you know what was the purpose for which you made this contract?"   The court sustained the objection to the question, and error is assigned.   At that time there had been nothing to indicate that the defendant proposed to set up the defense now made.   Neither in the pleadings nor the proofs had anything appeared to indicate the defense. After the defense was admitted, the witness was recalled, and other witnesses for the plaintiff were fully questioned as to the purpose of the contract.

There are other assignments of error in the rulings upon the testimony, but I find no error in them, and do not consider them of sufficient importance to discuss.

3. Defendant propounded the following special question for the jury:

" Did the plaintiff, the Detroit Salt Company, refuse to deliver the salt, cooperage, sacks, and other personal property of the National Salt Company, situated in or on the plant of the Detroit Salt Company, prior to 12 o'clock noon of the 17th day of August, 1901 ?"

The court refused to submit it, for the reason that, under the evidence, it could not be answered by "yes" or "no." It was conceded that the plaintiff refused to deliver certain sacks and some other personal property until it was paid for the salt which had already been shipped.   But

the salt had already been delivered upon the warehouse floor. The salt referred to in the question was that loaded in the cars and ready for shipment. Defendant claimed plaintiff refused to allow it to be shipped. Plaintiff denied it. But if the jury should have found that the plaintiff had so refused, this would not be a violation of the contract sued on in this case. The shipments had been provided for by another contract subsequently entered into, which provided that it had nothing to do with the contract of July 28th. Shipments were not, therefore, made under the contract in suit, but on the one not at all involved here. The refusal to surrender the sacks and other personal property was no violation of the contract here in suit. The contract did not cover this property. Demand was not made under it. The property belonged to defendant, but was lawfully in plaintiff's possession until demand was made and possession refused. This rendered plaintiff subject to an action of replevin or trover.

4. Defendant made two motions for a new trial, the last based upon newly-discovered evidence, consisting of three letters written by Mr. Mulkey, the president of the plaintiff, to Mr. White, which it had found among its papers after the trial. These motions were overruled, and I think correctly. No sufficient search for these letters was made, before the trial, to form the basis for granting a new trial on the ground of newly-discovered evidence. Besides, as already stated, the defendant was not entitled to any favors by the court, inasmuch as it saw fit upon the trial to withhold evidence of the purposes of this contract, if they were such as it claimed to be. Had it done so, there might have been no occasion for its motion for a new trial.

Judgment should be affirmed.